1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   RACHEL L. JENSEN (211456)
    ROBERT R. HENSSLER JR. (216165)
3   JEFFREY J. STEIN (265268)
    655 West Broadway, Suite 1900
4   San Diego, CA  92101
    Telephone:  619/231-1058
5   619/231-7423 (fax)
    rachelj@rgrdlaw.com
6   bhenssler@rgrdlaw.com
    jstein@rgrdlaw.com
7
    Lead Counsel for Plaintiffs
8

9                    UNITED STATES DISTRICT COURT

10              SOUTHERN DISTRICT OF CALIFORNIA

11  In re OBALON THERAPEUTICS, INC.      )   Master File No. 3:18-cv-00352-
    SECURITIES LITIGATION                )   AJB-WVG
12                                       )
    ─────────────────────────────────── )
13                                       )   CLASS ACTION
    This Document Relates To:            )
14                                       )   CONSOLIDATED COMPLAINT
        ALL ACTIONS.                     )   FOR VIOLATION OF THE
15                                       )   FEDERAL SECURITIES LAWS
    ─────────────────────────────────── )
16                                       )   DEMAND FOR JURY TRIAL
    INTER-LOCAL PENSION FUND             )
17  GCC/IBT, TEAMSTER AFFILIATES         )
    PENSION PLAN, Individually and on    )
18  Behalf of All Others Similarly Situated, )
                                         )
19                      Plaintiffs,      )
                                         )
20             vs.                       )
                                         )
21  OBALON THERAPEUTICS, INC.,           )
    ANDREW P. RASDAL, WILLIAM J.         )
22  PLAVONIC, NOOSHIN HUSSAINY,          )
    KIM KAMDAR, Ph.D., RAYMOND           )
23  DITTAMORE, DOUGLAS FISHER, LES       )
    HOWE, SHARON STEVENSON, DVM          )
24  Ph.D., UBS SECURITIES LLC,           )
    CANACCORD GENUITY INC., STIFEL,      )
25  NICOLAUS & COMPANY,                  )
    INCORPORATED, AND BTIG, LLC,         )
26                                       )
                        Defendants.      )
27  ─────────────────────────────────── )

28

1481554_1

1
2

# TABLE OF CONTENTS

**Page**

3   I.  INTRODUCTION ................................................................ 1

4   II. JURISDICTION AND VENUE ........................................... 5

5   III. FACTUAL BACKGROUND ............................................. 6

6       A.  The History of Intragastric Balloons ..................... 6

7       B.  The History of Obalon ............................................ 7

8       C.  Obalon's Clinical Trials ......................................... 9

9       D.  Defendants Tout Obalon Balloons as Superior to the
            Competition ........................................................... 10

10  IV. SECURITIES ACT CLAIMS ......................................... 12

11      A.  The Securities Act Parties .................................... 13

12          1.  Securities Act Plaintiff ................................. 13

13          2.  Securities Act Defendants ........................... 13

14              a.  Obalon and the Executive Defendants .......... 13

15              b.  Director Defendants .......................... 14

16              c.  Underwriter Defendants ...................... 15

17      B.  Additional Factual Allegations for the Securities Act Claims .......... 15

18      C.  Securities Act Class .............................................. 18

19      D.  Securities Act Causes of Action ........................... 20

20  COUNT I ................................................................................ 20

21  COUNT II .............................................................................. 22

22  V.  EXCHANGE ACT CLAIMS ......................................... 22

23      A.  Exchange Act Parties ............................................ 23

24          1.  Exchange Act Plaintiff ................................. 23

25          2.  Exchange Act Defendants ............................ 23

26      B.  Additional Exchange Act Allegations .................. 24

27
28

1

2                                                                                          **Page**

3

4       1.    The Exchange Act Defendants Continued to
             Misrepresent the Obalon Balloon's Characteristics After
             the IPO ................................................................................ 24

5

6       2.    The Exchange Act Defendants Made Materially
             Misleading Statements and Omissions About the
             Company's Sales .................................................................. 26

7

8             a.    Sales Declined During the First Three Quarters of
                   2017 ............................................................................ 26

9             b.    Despite the Decline, the Exchange Act Defendants
                   Touted the Company's Purported Success .................... 28

10

11      3.    The Accounting Scheme ...................................................... 31

12            a.    The Exchange Act Defendants Launched a
                   Promotional Campaign to Inflate 4Q 2017
                   Revenues ................................................................... 31

13

14            b.    The Exchange Act Defendants Continue to Deny
                   Wrongdoing Even After an Insider Blows the
                   Whistle ...................................................................... 33

15

16   C.   The Exchange Act Defendants Made Actionable
        Misrepresentations and Omissions ................................................ 35

17      1.    Misrepresentations and Omissions Regarding the Product ...... 35

18      2.    Misrepresentations and Omissions Regarding the
             Company's Success During the First Three Quarters of
             2017 .................................................................................... 45

19

20      3.    Misrepresentations and Omissions Regarding 4Q 2017
             Sales ................................................................................... 48

21

22      4.    Misrepresentations and Omissions About the Company's
             Financial Condition at the Start of 2018 ............................... 50

23   D.   Obalon's False Financial Reporting ............................................... 52

24      1.    Obalon's 4Q 2017 Revenue Violated GAAP ......................... 52

25      2.    Obalon's Revenue Overstatement Was Material ................... 54

26   E.   The Truth Begins to Emerge ......................................................... 55

27      1.    The Northland Report .......................................................... 56

28

1
2                                                                                          **Page**
3
         2.   Obalon Reveals Its True Financial Condition When It
4             Announces a Secondary Offering and Then Is Forced to
              Cancel It ................................................................................ 60
5
         3.   Poor 1Q 2018 Results Shock the Market ................................. 62
6
    F.   Further Evidence of the Exchange Act Defendants' Scienter ........... 64
7
         1.   The Fraud Infected Obalon's Core Operations, Which the
8             Exchange Act Defendants Closely Monitored ......................... 64
9        2.   The Exchange Act Defendants Inflated 4Q 2017
              Revenues as a Pretext to Raise Money Through the
10            Secondary Offering ................................................................. 64
11       3.   Defendants Rasdal and Plovanic Signed Sarbanes-Oxley
              Certifications Attesting that the Company's Financial
12            Reports Were Accurate ............................................................ 66
13       4.   The Exchange Act Defendants' Compensation Structure
              Incentivized Fraud .................................................................. 66
14
    G.   Exchange Act Loss Causation ........................................................... 67
15
    H.   Exchange Act Presumption of Reliance ............................................ 68
16
    I.   No Safe Harbor for Exchange Act Violations ................................... 70
17
    J.   Exchange Act Class ........................................................................... 70
18
    K.   Exchange Act Causes of Action ....................................................... 72
19
COUNT III ....................................................................................................... 72
20
COUNT IV ....................................................................................................... 76
21
PRAYER FOR RELIEF ................................................................................... 77
22
JURY DEMAND ............................................................................................... 78
23
24
25
26
27
28

Lead Plaintiff Inter-Local Pension Fund GCC/IBT and Plaintiff Teamster Affiliates Pension Plan (collectively, "Plaintiffs"), by and through Lead Counsel, bring this securities action against Defendants[1] on behalf of themselves and a class of investors as defined herein.  In support of their claims, Plaintiffs allege as follows.

## I.    INTRODUCTION

1.    Obalon Therapeutics, Inc. ("Obalon" or the "Company") is a medical device company whose first and only product is the Obalon balloon system ("Obalon Balloon"), a purported weight loss treatment program that consists of an intragastric balloon that blows up in a patient's stomach for six months to simulate a feeling of satiety.  To use the Obalon Balloon, a patient must swallow one or more large capsules each containing a balloon, which is attached to a long catheter that protrudes from his or her mouth.  Once swallowed, the capsule migrates down the esophagus to the stomach, and an x-ray is taken to check the placement.  After the capsule dissolves, a doctor externally inflates the balloon with a nitrogen sulfur-hexafluoride gas through the catheter.  Then the catheter is detached and pulled out from the stomach the same way it went down – up through the throat.  After six months, a doctor performs an endoscopy to pop and remove the balloon.  According to Obalon, patients can fit up to three 250 cc balloons in their stomach at one time.

2.    Obalon is not the only maker of intragastric balloons.  Apollo Endosurgery, Inc. ("Apollo") makes the Orbera system ("Orbera"), and ReShape Lifesciences, Inc. produces the ReShape Balloon System ("ReShape").  Orbera and ReShape are saline-filled devices that are placed and removed from patients' stomachs using an endoscopic procedure.  Obalon, therefore, is the only company selling a balloon that must be swallowed by the patient and then filled with gas.

3.    Obalon gained approval from the U.S. Food and Drug Administration ("FDA") to sell the Obalon Balloon after clinical trials showed some modest weight

---

[1]    The Defendants are defined individually and collectively in the Parties sections below.  *See* §§IV.A.2 & V.A.2.

loss improvements over diet and exercise alone when three balloons were used at once. The clinical trials also demonstrated, however, that the Obalon Balloon did not measure up to its competition in several important ways. First, patients in the trial had difficulty swallowing the large capsule and catheter. This was despite the fact that Obalon had pre-screened for patients who could swallow such a large placebo pill; yet, 9.3% of those pre-screened patients *still* could not swallow the Obalon Balloon capsule. Second, the Obalon Balloon caused 90% of patients in the trial to suffer adverse effects, such as nausea, pain, and vomiting. This translated into a competitive disadvantage because Obalon patients experienced abdominal pain at much higher rates than were experienced for the Orbera or ReShape products. Third, the Obalon Balloon was not as effective as the other devices already on the market, resulting for example, in 46% less weight loss than Orbera patients achieved.

4.      Nevertheless, Obalon plowed ahead with its initial public offering ("IPO"). In its registration statement, filed September 9, 2016, and amended on September 26, 2016 ("Registration Statement"), and in its prospectus, as supplemented by Form 424B4 filed on October 6, 2016 (together with the Registration Statement, the "Offering Materials") for the IPO, Obalon invoked a direct comparison to Orbera and ReShape, claiming it had "developed our Obalon balloon system to overcome the limitations" of these competitors' products. But in the course of making its comparisons, the Company made several false or misleading statements to investors.

5.      By way of example, even though patients struggled to swallow the Obalon Balloon capsules, Defendants said it had achieved a "convenient placement" relative to other products. And even though the Obalon Balloon caused more pain than competing products on the market, Defendants claimed its product had a more "[f]avorable safety profile." And, finally, even though the Obalon Balloon proved less effective than other balloons on the market, the Offering Materials claimed the Obalon Balloon was superior to the competition because it was "designed to provide progressive and sustained weight loss." Based on these false or misleading

1   representations, among others, Obalon was able to extract $67.4 million from

2   investors through the IPO.

3       6.      After the IPO, Obalon, Chief Executive Officer ("CEO") Andrew P.

4   Rasdal, and Chief Financial Officer ("CFO") William J. Plovanic (collectively, "the

5   Exchange Act Defendants") ramped up their rhetoric regarding the Obalon Balloon's

6   supposed superiority.  Despite their knowledge of the product's shortcomings from the

7   clinical trials, Rasdal misleadingly claimed that the Obalon Balloon was "easy to

8   place," that the adverse events amounted to just "some minor discomfort for the first

9   24 hours," and it was better than competitors' products "because it works."  These

10  statements flew in the face of the results of the clinical trial demonstrating that the

11  Obalon Balloon is difficult to place, had frequent and lasting adverse effects, and was

12  less effective than competitors' intragastric balloons.

13      7.      For months after the IPO, analysts accepted Obalon's representations and

14  lauded the Obalon Balloon as the next big weight loss device, projecting a *2 billion*

15  *valuation* and consistently recommending that investors buy the stock.  Then, on

16  June 21, 2017, Northland Securities, Inc. ("Northland") issued a lengthy report with a

17  detailed analysis and critique of Obalon's clinical trial results based on information

18  compiled from various scientific blogs, articles, and journals.  Northland informed the

19  market that the Obalon Balloon technology actually lagged behind existing technology

20  and would not drive sales for the Company.  As a result of this disclosure, Obalon's

21  stock price fell.

22      8.      Meanwhile, the Company struggled to sell the product as consumers lost

23  interest.  Throughout the first three quarters after the Company's U.S. launch, sales

24  declined and revenues plateaued.   Rather than come clean about Obalon's

25  disappointing results, however, the Exchange Act Defendants concealed them.  For

26  example, Defendant Rasdal assured investors that consumers' "commitment and . . .

27  interest is very, very high."

28

9.     Because Obalon could not hide its falling sales for long, the Exchange Act Defendants devised a scheme to artificially inflate them and then immediately capitalize on their fraud.  In the fourth quarter of 2017 ("4Q 2017"), Obalon launched an aggressive promotional campaign that encouraged doctors to pre-order Obalon Balloons in exchange for steep discounts and promises of significant benefits in the future, such as consumer leads, free advertising, and patient rebates.  The Exchange Act Defendants' aggressive promotion of the Obalon Balloon caused doctors to buy product in 4Q 2017 that they otherwise would have bought in future quarters, if at all. Even though the Company did not require upfront payment, Obalon recorded the revenue for every Obalon Balloon ordered that quarter, but without reducing the value to account for non-payment and Obalon's obligation to provide services later.  The Company failed to disclose that 4Q 2017 revenues were artificially inflated and not indicative of future performance.

10.     Obalon immediately exploited its inflated revenues.  Rather than wait to disclose Obalon's 4Q 2017 performance in due course, Obalon rushed to release "preliminary unaudited revenue" just five days after the quarter ended.  Defendant Rasdal touted Obalon's overstated numbers to celebrate its "strongest quarter" and hail 2017 as a "transformational year."  Analysts bought into the storyline, telling investors that "everything is going in the right direction."

11.     Just 11 days later, Obalon moved to capitalize on the market's misconception about its competitive position.  The Company announced a secondary public offering seeking $35 million in additional funding from investors.  Obalon scheduled the secondary offering to close just days later.

12.     The Exchange Act Defendants almost pulled off their scheme.  But an anonymous whistleblower from within the Company tipped off the Company's outside auditors at KPMG US LLP ("KPMG") about Obalon's accounting fraud on the eve of the secondary offering.  As a result, the Company cancelled the offering and promised to investigate the whistleblower's claims.  A month later, Obalon conceded that it had

1    reported inflated revenues.  As a result of the secondary offering and the whistleblower

2    complaint, Obalon's stock price declined.

3         13.    Since then, the Obalon Balloon has continued its trajectory of deflated

4    results, but the Exchange Act Defendants have run out of ways to hide it.  On May 10,

5    2018, the Company disclosed abysmal results for the first quarter of 2018

6    ("1Q 2018"), which revealed the damage caused by the improper promotion and the

7    downward trajectory of the Company as a whole.  After the market learned of this

8    performance, the stock price crashed, thereby damaging investors further.  Obalon has

9    not recovered from this fraud and now sits on the verge of collapse.

10        14.    To recover the losses borne by Obalon's investors, Lead Plaintiff now

11   seeks relief against the Exchange Act Defendants pursuant to §§10(b) and 20(a) of the

12   Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated

13   thereunder, on behalf of itself and all persons or entities that purchased or acquired

14   publicly traded securities of Obalon between October 6, 2016 and May 11, 2018,

15   inclusive ("Exchange Act Class Period"), and who were damaged thereby ("Exchange

16   Act Class").  Additionally, Plaintiff Teamster Affiliates Pension Plan ("Securities Act

17   Plaintiff") seeks monetary relief against the Company, the Executive Defendants, the

18   Director Defendants, and the Underwriter Defendants (as defined below) (collectively,

19   "Securities Act Defendants") pursuant to §§11 and 15 of the Securities Act of 1933

20   ("Securities Act"), and the rules promulgated thereunder, on behalf of itself and all

21   persons or entities that purchased or acquired Obalon common stock pursuant and/or

22   traceable to the Registration Statement in connection with the IPO and who were

23   damaged thereby ("Securities Act Class").

24   **II.    JURISDICTION AND VENUE**

25        15.    The Securities Act claims asserted herein arise under §11 and §15 of the

26   Securities Act, 15 U.S.C. §§77k and 77o, and the rules promulgated thereunder by the

27   U.S. Securities and Exchange Commission ("SEC").

28

16.     The Exchange Act claims asserted herein arise under §10(b) and §20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §22 of the Securities Act, 15 U.S.C. §77v, and/or §27 of the Exchange Act, 15 U.S.C. §78aa.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c) and §22 of the Securities Act as Obalon is headquartered in this District and certain of the Defendants reside, and/or maintain operations, in this District.  Defendants' wrongful acts emanated from this District in whole or part, including the dissemination of materially misleading statements in this District, the purchase of the Company's common stock by members of the Exchange Act or Securities Act Classes who reside in this District, and the sale of the Company's common stock in this District by certain of the Underwriter Defendants (as defined in ¶¶46-50 below).

## III.     FACTUAL BACKGROUND

### A.     The History of Intragastric Balloons

19.     Intragastric balloons are not a new concept.  Gas-filled balloons gained popularity in the 1970s and 1980s as a method for treating obesity.  The devices' popularity peaked in the mid-1980s, when up to 20,000 balloons were placed in patients' stomachs in a single year.  However, safety concerns proved too difficult to overcome.  Reports surfaced of patients sustaining serious injuries from the balloons, including bowel obstructions and stomach ulcers.  Intragastric balloon companies voluntarily withdrew FDA approval, and intragastric balloons abruptly left the market.

20.     Intragastric balloons resurfaced in the United States in 2015, when the FDA approved two saline-filled products that claimed to mitigate the risks of the gas-filled balloons from decades past.  The most successful of these is Orbera, which is a single saline-filled balloon that represents 75% of sales in the market.  Orbera is manufactured by Apollo, a large obesity-focused company that also manufactures the

1 Lap-Band.  The other competitor is ReShape, which produces a homonymous system

2 consisting of two connected saline-filled balloons.  Both the Orbera and ReShape

3 balloon products are placed and removed using an endoscopic procedure, so that no

4 painful or difficult swallowing is required.

5       21.    The market for intragastric balloons remains small.  Although they act as

6 an alternative to surgical weight loss measures, balloons have problems of their own.

7 Patients complain about discomfort and adverse effects from the balloons, including

8 nausea and vomiting.  Also, harboring a foreign object in one's stomach for a long

9 period of time can lead to complications, such as migration to unintended portions of

10 the digestive tract and ulcers from the balloons rubbing against the stomach wall.

11 **B.**    **The History of Obalon**

12       22.    Obalon was founded in 2008 and is headquartered in Carlsbad,

13 California.  The Company's one and only product is the Obalon Balloon, which it

14 launched in the Middle East, Europe, and Brazil in 2012.  By 2015, Obalon had

15 discontinued sales in Europe and Brazil, and all of its sales were to Bader Sultan &

16 Bros. Co. W.L.L. ("Bader"), a distributor from Kuwait with an 8.8% stake in Obalon

17 and a contractual obligation to purchase as many balloons as Obalon deems

18 appropriate.  Before Obalon's U.S. launch, 100% of its revenues came from Bader.

19 But when the Company entered the U.S. market in January 2017, it stopped foreign

20 sales to focus exclusively on the United States.  Obalon later resumed its sales of

21 Obalon Balloons to Bader in the third quarter of 2017 ("3Q 2017").

22       23.    The Obalon Balloon is designed to work the same way as competing

23 products, Orbera and ReShape.  It temporarily occupies space in the stomach with an

24 aim to satiate hunger.  Placement of the Obalon Balloon occurs in a unique way,

25 however.  Rather than implanting the device using an endoscopic procedure, the

26 doctor helps the patient swallow the balloon capsule and then inflates it externally

27 through a catheter that protrudes from the patient's mouth as shown in the image

28 below.  If the patient is able to successfully swallow the capsule, and it migrates down

the esophagus to his or her stomach, the doctor then takes an x-ray of the abdomen to ensure placement.  The capsule then dissolves and the doctor inflates the balloon through the attached catheter that is still protruding from the patient's mouth.  Once inflated, the catheter is detached and pulled out through the patient's esophagus and up through the throat again.



24.    According to Obalon, patients can fit up to three balloons in their stomach at one time, but may not place more than one in a single visit.  Patients who wish to add an additional balloon must pay for it, and then return to the doctor to repeat the placement procedure after their stomachs adjust to the previously placed balloons.  After a patient has lived with the inflated Obalon Balloon(s) for six months, all the balloons in his or her stomach must be removed.  The removal procedure

1   requires a doctor to sedate the patient and conduct an endoscopy to pop, grasp, and

2   extract the balloons through the patient's mouth.

3        25.   Obalon Balloons are expensive, and insurance policies do not cover

4   them.  One balloon implantation costs the patient $2,333 to $3,000 ($7,000 to $9,000

5   for three), and the results are marginal.  In practice, most patients swallow less than

6   three balloons, and these patients do not see results beyond what they could expect

7   from diet and exercise alone.  Patients who pay for, and swallow, all three balloons

8   see improved performance, but still lose only 15 pounds on average throughout the

9   course of the six-month treatment.  After the balloons are removed, most patients

10  begin to regain the weight they lost.

11       **C.   Obalon's Clinical Trials**

12       26.   To sell the Obalon Balloon product in the United States, Obalon first

13  needed approval from the FDA.  In February 2015, the Company began its clinical

14  trial, the "Six Month Adjunctive Weight Reduction Therapy" ("SMART") study.  The

15  SMART study set out to demonstrate that the Obalon Balloon was "more effective

16  than a medically supervised diet and exercise program alone for 24 weeks."  Obalon

17  conducted the trial from March 2015 to May 2016, providing three Obalon Balloons

18  to half the patients and placebo capsules without balloons to the rest.  Both groups

19  also received consultations with a registered dietician every three weeks.  After six

20  months, the subjects who were able to swallow three Obalon Balloons lost an average

21  of 6.86% of their total body weight, while the group without balloons lost 3.59% of

22  their total body weight.  Subjects who swallowed one or two Obalon Balloons lost

23  only 2.90% of their total body weight, *less* than the control group without any

24  balloons.  The subjects who received Obalon Balloons had them removed at the end of

25  the 24-week period, but still received consultations with the dietician for 24 more

26  weeks.  These patients regained 10% of the weight they lost during this time period.

27

28

**D.    Defendants Tout Obalon Balloons as Superior to the Competition**

27.    When Obalon first introduced the Obalon Balloon to the market, Defendants set out to distinguish it from intragastric balloons offered by Orbera and ReShape.  Defendants focused on three attributes that they touted as distinguishing the Obalon Balloon from the competition: (i) the balloons are gas-filled rather than saline-filled; (ii) the system allowed patients to place one to three balloons in individual procedures rather than one procedure implanting one balloon (Orbera) or two connected balloons (ReShape); and (iii) the patient could swallow the capsule to place the Obalon Balloon device rather than undergoing an endoscopy.  Defendants claimed that the Obalon Balloon's unique traits addressed the market's concerns about intragastric balloons, thereby allowing Obalon to "overcome the limitations" of Orbera and ReShape's products.

28.    First, Defendants claimed that the Obalon Balloon introduced a dramatically improved implantation procedure.  Rasdal, for example, claimed that the product was "easy to place" and "about as easy and convenient as it can [be]."  In reality, the treatment was much more difficult to administer than Defendants let on because the capsule is large and very difficult to swallow.  For purposes of the SMART study, Obalon quietly screened prospective patients to make sure they could swallow a "placebo capsule" the same size as the Obalon capsule.  If a patient could not swallow the placebo capsule, he or she was automatically disqualified from participating in the study.  Obalon has not disclosed the number of patients who failed to swallow the placebo capsule during the screening process, but we do know that of the 711 people screened for participation in the SMART study, 281 (40%) of them were deemed "Screen Failure[s]."  And even after swallowing the placebo capsule to get through the screening process, many patients still could not swallow the Obalon pill with a catheter attached in the actual study.  Of the 216 patients who successfully swallowed the placebo and then attempted to swallow the Obalon pill during the

1   SMART trial, 20 more people (9.3%) failed to swallow the actual Obalon Balloons –
2   18 failed to swallow the first balloon, and 2 more failed to swallow balloons on their
3   subsequent attempts.  The swallowing issue became so problematic after the U.S.
4   launch, that doctors started having to use "numbing spray" to help patients keep the
5   pills down.   In January 2017, to assuage doctors' concerns about swallowing
6   difficulty, Obalon instituted a "swallow guarantee" that required the Company to bear
7   the costs associated with patients' swallowing failures.

8          29.    But swallowing was not the only problem.  Although the Obalon Balloon
9   allowed patients to skip the first of two endoscopies typically required to place an
10   intragastric balloon, skipping this step is risky.  Doctors placing Orbera and ReShape
11   balloons use the initial endoscopy to scan the patients' stomachs for any medical
12   issues that could create complications.  By design, Obalon patients do not have the
13   benefit of this safety screening procedure.  Instead, patients subject themselves to a
14   difficult swallowing procedure, undergo repeated x-rays of their abdomen, and blindly
15   accept a balloon in their stomach.  The process for Obalon Balloons was too difficult
16   to bear for many early patients, as two thirds stopped at one or two balloons, rendering
17   the treatment ineffective.

18          30.    Second, Defendants minimized the negative side effects of the Obalon
19   Balloons.  Rasdal claimed Obalon's product had a "[f]avorable safety profile" with just
20   "some minor discomfort for the first 24 hours."  These statements were also untrue.  In
21   reality, *nearly all* subjects in the SMART trial – 90.8% – experienced a device-related
22   adverse event, and most patients experienced more than one.  In fact, 73% of subjects
23   experienced abdominal pain, which was *worse* than both Orbera (58%) and ReShape
24   (55%).   Contrary to Defendants' representations, nothing from the SMART study
25   demonstrated that pain dissipated within 24 hours.  Rather, it showed that 65% of
26   subjects had pain that lasted less than one week, and 35% of subjects experienced pain
27   for more than one week.  Of the latter category, 78% of subjects had pain lasting longer
28   than *two weeks*.  The Obalon Balloons also led to several reports of injury.  Since the

1  SMART study, patients have reported serious conditions resulting from the Obalon
2  Balloon, including "cratered gastric ulcers" and "perforation of the stomach."

3      31.    Third, Obalon touted the effectiveness of its devices relative to its
4  competitors' devices.  In its filings with the SEC, the Company claimed its product
5  design enabled it to "provide progressive and sustained weight loss" even after the
6  balloons were removed.  In reality, the Obalon Balloon was much *less* effective than
7  other devices on the market.  As an initial matter, the Obalon Balloon is *no more*
8  *effective than diet and exercise alone* when subjects decide to stop at one or two
9  balloons.  Even when all three balloons are successfully swallowed and placed, the
10 Obalon Balloon is significantly less effective than its competitors' products.  Orbera
11 patients lost 46% more weight on average than Obalon patients; they lost 22 pounds
12 on average while Obalon patients lost only 15 pounds on average.  Moreover,
13 Defendants claimed that weight loss created by the Obalon Balloon device is more
14 "sustainable" than other products on the market, and that Obalon's patients gained
15 their weight back less rapidly than competitors' patients following removal of the
16 balloons.  This representation has since been revealed to lack substance, as it "does
17 not mean anything clinically."  Obalon also failed to explain that the patients in the
18 SMART study received free dietary counseling, which is not available to paying
19 customers and not attributable to the Obalon Balloon.  In any event, Orbera patients
20 still enjoyed more weight loss over a 12-month period than Obalon patients, losing 16
21 pounds on average compared to 13 pounds on average for Obalon patients.

22 **IV.    SECURITIES ACT CLAIMS**

23     32.    The claims addressed in this section (Counts I and II, below) are brought
24 on behalf of Plaintiff Teamster Affiliates Pension Plan and the Securities Act Class
25 pursuant to §§11 and 15 of the Securities Act.  Count I is brought against all Securities
26 Act Defendants and Count II is brought against Rasdal, Plovanic, and the Director
27 Defendants (defined in ¶¶40-45, below). These claims are, in effect, a separate
28 complaint which asserts strict liability claims. The Securities Act claims are not based

1    on any allegations of intentional, knowing, or reckless misconduct and thus do not

2    sound in fraud.  Securities Act Plaintiff specifically disclaims any allegations of fraud,

3    scienter, or recklessness in connection with these specific non-fraud claims.

4          **A.     The Securities Act Parties**

5                **1.     Securities Act Plaintiff**

6          33.    Securities Act Plaintiff Teamster Affiliates Pension Plan purchased

7    shares of common stock pursuant and/or traceable to the Registration Statement in

8    connection with the IPO, *see* Exhibit A, and has been damaged thereby.

9                **2.     Securities Act Defendants**

10         34.    Securities Act Plaintiff Teamster Affiliates Pension Plan asserts strict

11   liability claims under §§11 and 15 of the Securities Act against Obalon, the Executive

12   Defendants, the Director Defendants, and the Underwriter Defendants ("Securities Act

13   Defendants").

14              **a.     Obalon and the Executive Defendants**

15         35.    Defendant Obalon Therapeutics, Inc. ("Obalon" or the "Company") is a

16   Delaware corporation founded in 2008 with its principal place of business in this

17   District at 5421 Avenida Encinitas, Carlsbad, California 92008.  The Company's

18   shares are traded on the NASDAQ stock exchange under the ticker symbol "OBLN."

19         36.    Defendant Andrew P. Rasdal ("Rasdal") has been Obalon's CEO,

20   President, and a director since June of 2008.  Rasdal works in this District at Obalon's

21   headquarters.

22         37.    Defendant William J. Plovanic ("Plovanic") has been the Obalon's CFO

23   since March 2016.  Plovanic works in this District at Obalon's headquarters.

24         38.    Defendant Nooshin Hussainy ("Hussainy") has been the Vice President

25   of Finance at Obalon since December 2011.  Hussainy works in this District at

26   Obalon's headquarters.

27         39.    Together, Rasdal, Plovanic, and Hussainy are referred to as the

28   "Executive Defendants."  The Executive Defendants participated in the drafting,

preparation, and approval of various untrue and misleading statements contained in the Offering Materials.  Each of these Defendants signed the Registration Statement, guaranteeing the truth and accuracy of the statements contained, or incorporated, therein, and guaranteeing that the Registration Statement and the materials incorporated therein were free from misstatements or omissions of material fact.

### b.   Director Defendants

40.   Kim Kamdar, Ph.D. ("Kamdar") has been a director of the Company, which is headquartered in this District, since January 2008.  Kamdar signed the false or misleading Registration Statement.

41.   Raymond Dittamore ("Dittamore") has been a director of the Company, which is headquartered in this District, since March 2016.  Dittamore signed the false or misleading Registration Statement.

42.   Douglas Fisher ("Fisher") has been a director of the Company, which is headquartered in this District, since May 2012.  Fisher signed the false or misleading Registration Statement.

43.   Les Howe ("Howe") has been a director of the Company, which is headquartered in this District, since January 2016.   Howe signed the false or misleading Registration Statement.

44.   Sharon Stevenson, DVM Ph.D. ("Stevenson") has been a director of the Company, which is headquartered in this District, since January 2008.  Stevenson signed the false or misleading Registration Statement.

45.   Kamdar, Dittamore, Fisher, Howe, and Stevenson are referred to as the "Director Defendants."   The Director Defendants participated in the drafting, preparation, and/or approval of the false or misleading statements contained or incorporated in the Offering Materials.   Each Director Defendant signed the Registration Statement, attesting to the truth and accuracy of the statements contained or incorporated therein, and guaranteed that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

### c.     Underwriter Defendants

46.     UBS Securities LLC ("UBS") is a brokerage firm based in New York, New York. UBS acted as an underwriter of Obalon's IPO, helping to draft and disseminate the Offering Materials.

47.     Canaccord Genuity Inc. ("Canaccord") is a full service investment bank located in Boston, Massachusetts.  Canaccord acted as an underwriter of Obalon's IPO, helping to draft and disseminate the Offering Materials.

48.     Stifel, Nicolaus & Company, Incorporated ("Stifel") is an investment banking firm that offers financial advisory services.  Stifel acted as an underwriter of Obalon's IPO, helping to draft and disseminate the Offering Materials.

49.     BTIG, LLC ("BTIG") provides institutional brokerage and fund services. BTIG acted as an underwriter of Obalon's IPO, helping to draft and disseminate the Offering Materials.

50.     UBS, Canaccord, Stifel, and BTIG are referred to as the "Underwriter Defendants."   The Underwriter Defendants participated in the drafting and dissemination of the Offering Materials and collectively received discounts and commissions of $5,200,000 in connection with the IPO.  The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Offering Materials were prepared properly, accurately, and free from misstatements or omissions of material fact.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

### B.     Additional Factual Allegations for the Securities Act Claims

51.     Obalon filed the Registration Statement on September 9, 2016, utilizing Form S-1, and amended it on September 26, 2016, using Form S-1/A.  Pursuant to the Registration Statement and other Offering Materials, the Company completed the IPO on October 12, 2016.  The Company raised net proceeds of $67.4 million by selling 5 million shares at $15 per share.  The Registration Statement and other Offering

1  Materials contained untrue statements of material fact and omitted other facts
2  necessary to make statements therein not materially false or misleading.

3      52.    In the Offering Materials, Obalon invoked a comparison to its
4  competitors, representing to investors that "traditional intragastric balloons suffer
5  limitations that are impeding their adoption, including their rate of SADEs, a lack of
6  comfort and tolerability, a limited ability to provide progressive and sustained weight
7  loss and an inconvenient placement procedure."  Obalon claimed its product solved
8  these problems and that the Company "***developed our Obalon balloon system to***
9  ***overcome the limitations of traditional intragastric balloons***."   Obalon then
10 proceeded to misrepresent three attributes of the Obalon Balloon relative to the
11 competition: (i) its ease of placement; (ii) its comfort and safety; and (iii) its
12 effectiveness.  Defendants' representations about these attributes misstated the real
13 results it had obtained during the SMART study.

14     53.    First, the Offering Materials repeatedly touted the Obalon Balloon's
15 "***[s]imple and convenient placement***" using "a swallowable capsule."  The company
16 stated: "We designed the capsule to be large enough to accommodate the folded
17 balloon, yet ***small enough to be swallowed***."  In the "Risk Factors" section, Obalon
18 wrote:  "In our SMART trial, 7.6% of the combined treatment and control group
19 patients failed to swallow a capsule with the microcatheter attached despite success
20 swallowing a placebo that did not have a catheter attached."  This statement was itself
21 materially misleading.  To be accurate, the Registration Statement should have
22 disclosed the percentage of patients who could swallow neither the placebo nor the
23 Obalon Balloon pill.  To this date, Obalon has not disclosed this number.

24     54.    These statements of fact were materially false or misleading and/or
25 omitted material facts for the following reasons:

26          (a)    Obalon failed to disclose that its screening procedure for the
27 SMART study included a placebo pill test to ensure each participant could swallow
28 the oversized Obalon Balloon pill, or that this and other screening criteria weeded out

40% of the original patient pool.  Obalon also decreased its reported failure rate by including control group subjects who swallowed the fake pill.  The rate of failed swallows for subjects who attempted to swallow the Obalon Balloon pill was actually much higher – 9.3%; and

(b)    Obalon also failed to disclose that its placement procedure involved multiple x-rays to the patient's abdomen but skipped the precautionary scan of the patient's gastrointestinal lining.

55.    Second, Obalon represented in the Registration Statement that its balloon had superior "patient tolerability and comfort" and a "[f]avorable safety profile." Specifically, it wrote:

> *Favorable safety profile*. In our pivotal SMART trial, only one of 336 (0.3%) patients that received our Obalon balloon experienced a SADE. As of June 2016, we had sold over 23,000 units of our earlier generation Obalon balloon systems in international markets and had only nine SADEs reported to us, none of which were required to be reported to the applicable foreign regulatory authorities.  Our investigations determined that all of the international SADEs occurred in patients where the device was not used in accordance with approved labeling.

> *Improved patient tolerability and comfort*.  Our Obalon balloon is filled with a proprietary mix of gas, as opposed to heavier saline solutions used in traditional intragastric balloons.  Our system is designed to use three Obalon balloons over the course of treatment, allowing the volume in the stomach to be gradually increased.  We believe these design elements have the potential to improve patient comfort and tolerability of our Obalon balloon.

56.    These statements of fact were materially false or misleading and/or omitted material facts for the following reasons:

(a)    Obalon failed to disclose that the product caused a *higher* rate of some adverse effects.  For instance, it failed to disclose that 73% of subjects experienced abdominal pain, a greater percentage of patients that experienced these symptoms than either Orbera (58%) or ReShape (55%); and

(b)     Obalon failed to disclose that 35% of patients experienced pain for more than one week or that of those patients, 78% experienced pain that lasted longer than *two weeks*.

57.     Third, the Offering Materials represented that the Obalon Balloon was superior to competitors' products because it provided "[p]rogressive weight loss with durable results":

> ***Progressive weight loss with durable results***. In our SMART trial, patients in the Obalon treatment group lost, on average, approximately twice as much body weight as patients in the sham-control group.  In addition, patients in the Obalon treatment group showed, on average, progressive weight loss over the entire six-month balloon treatment period, and maintained, on average, 89.5% of the weight loss six months after balloon removal.

58.     These statements were materially false or misleading and/or omitted material facts for at least the following reasons:

(a)     Obalon failed to disclose that its product tested worse than its competitors on the primary endpoints.  For example, Orbera patients lost 22 pounds over the course of the treatment, while Obalon patients lost only 15 pounds; and

(b)     Obalon failed to disclose that it had no scientific basis for its claim that the balloon would continue to facilitate weight loss after it was removed from the patient's body.

**C.     Securities Act Class**

59.     Securities Act Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure for violations of §§11 and 15 of the Securities Act, and the SEC rules promulgated thereunder, on behalf of all persons or entities that purchased or acquired the stock pursuant or traceable to the Registration Statement ("Securities Act Class").  Excluded from the Securities Act Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors,

1   or assigns, and any entity in which Defendants have or had a controlling interest as

2   well as the judicial officers overseeing this action and their immediate families.

3          60.     Members of the Securities Act Class are so numerous that joinder of all

4   members is impracticable.  The Company has numerous holders of outstanding stock,

5   which represent an aggregate principal amount of approximately $60 million.  While

6   the exact number of Securities Act Class members will be determined in discovery,

7   Securities Act Plaintiff believes that Securities Act Class members number at least in

8   the hundreds, if not the thousands, and that they are geographically dispersed.

9          61.     Securities Act Plaintiff's claims are typical of the claims of the members

10  of the Securities Act Class because it and all other class members sustained damages

11  arising out of the Securities Act Defendants' wrongful conduct complained of herein.

12         62.     Securities Act Plaintiff will fairly and adequately protect the interests of

13  the Securities Act Class members and have retained Lead Counsel, who are

14  experienced and competent in class actions and securities litigation.  Securities Act

15  Plaintiff has no interests that are contrary to, or in conflict with, the members of the

16  Securities Act Class that it seeks to represent.

17         63.     A class action is superior to all other available methods for the fair and

18  efficient adjudication of this controversy since joinder of all members is

19  impracticable.  Furthermore, as the damages suffered by individual members of the

20  Securities Act Class may be relatively small, the expense and burden of individual

21  litigation make it impossible for the members of the Securities Act Class to

22  individually redress the wrongs done to them.  There will be no difficulty in the

23  management of this action as a class action.

24         64.     Questions of law and fact common to the members of the Securities Act

25  Class predominate over any questions that may affect only individual members in that

26  the Securities Act Defendants have acted on grounds generally applicable to the entire

27  Securities Act Class.  Questions of law and fact common to the Securities Act Class

28  include:

(a)    whether the Securities Act Defendants violated the federal securities laws;

(b)    whether the Offering Materials contained or incorporated material misrepresentations;

(c)    whether the Securities Act Defendants failed to disclose material facts in the Offering Materials or correct material facts previously disseminated;

(d)    whether the prices of the stock were artificially inflated due to the material nondisclosures and/or misrepresentations contained or incorporated in the Offering Materials; and

(e)    whether the members of the Securities Act Class have sustained damages due to the stock value's decline when the truth was revealed (and the artificial inflation decreased), and, if so, the appropriate measure of damages.

**D.     Securities Act Causes of Action**

**COUNT I**

**For Violation of §11 of the Securities Act**
**Against All Securities Act Defendants**

65.    Securities Act Plaintiff incorporates ¶¶1-5, 14-64 by reference as though set forth fully herein.

66.    The Offering Materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and/or omitted facts required to be stated therein.

67.    The Executive and Director Defendants each signed the Registration Statement and caused it to be declared effective by the SEC on or about October 5, 2016.

68.    Obalon is the registrant for the IPO and, as issuer of the shares, Obalon is strictly liable to the Securities Act Plaintiff and Class for the misstatements and omissions.

69.     Each of the Securities Act Defendants named herein is responsible, and strictly liable, for the contents and dissemination of the Offering Materials.

70.     The Securities Act Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As a result of their roles with Obalon, and their contacts and communications, the Director Defendants and the Underwriter Defendants should have known of the untrue and misleading statements of material fact and omissions contained in the Offering Materials.  The Securities Act Defendants caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance and sale of 5,000,000 Obalon shares, which Securities Act Plaintiff and the Securities Act Class purchased.

71.     The Securities Act Defendants lacked reasonable grounds, and failed to make a reasonable investigation, to believe the Offering Materials were true and that the Offering Materials disclosed all the facts necessary to ensure that their statements were not false or misleading.

72.     By reason of the conduct herein alleged, each Securities Act Defendant violated §11 of the Securities Act.

73.     The Securities Act Plaintiff and the Securities Act Class acquired Obalon common stock traceable to the Registration Statement.

74.     The Securities Act Plaintiff and the Securities Act Class have sustained damages as a result of Securities Act Defendants' violations alleged herein because the value of Obalon stock has declined substantially due to these violations.

75.     At the time of their purchases of Obalon common stock, the Securities Act Plaintiff and other members of the Securities Act Class lacked knowledge of the facts concerning Security Act Defendants' wrongful conduct and could not have reasonably discovered those facts at the time.

76.     Prior to filing the complaint, less than one year had elapsed from the time that the Securities Act Plaintiff discovered or reasonably could have discovered the

facts upon which the complaint is based.  Similarly, less than three years elapsed from the time of the IPO to the filing of the complaint.

**COUNT II**

**For Violation of §15 of the Securities Act**
**Against Rasdal, Plovanic, Hussainy, and the Director Defendants**

77.     Securities Act Plaintiff incorporates ¶¶1-5, 14-76 by reference as though set forth fully herein.

78.     This Count is brought pursuant to §15 of the Securities Act against the Executive and Director Defendants.

79.     Each of the Executive and Director Defendants was a control person of Obalon by virtue of his or her position as an owner, director, and/or senior officer of Obalon.  The Executive Defendants oversaw all operations and financial controls at Obalon, and Obalon could not have completed the IPO without the Executive and Director Defendants signing or authorizing their signatures on the Registration Statement.

80.     The Executive and Director Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Obalon.

81.     Prior to filing the complaint, less than one year had elapsed from the time that the Securities Act Plaintiff discovered or reasonably could have discovered the facts upon which the complaint is based.  Similarly, less than three years elapsed from the time of the IPO to the filing of the complaint.

## V.     EXCHANGE ACT CLAIMS

82.     The claims addressed in this section (Counts III and IV, below) are brought pursuant to §§10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. Count III is brought against all Exchange Act Defendants and Count IV is brought against Defendants Rasdal and Plovanic.  These claims are, in effect, a separate complaint from the Securities Act claims above.  For purposes of

these claims only, Lead Plaintiff alleges that, in violation of the Exchange Act, the Exchange Act Defendants made false or misleading statements, and/or omitted material facts necessary to make their statements not false or misleading to investors.

### A.   Exchange Act Parties

#### 1.   Exchange Act Plaintiff

83.   The Court-appointed Lead Plaintiff, Inter-Local Pension Fund GCC/IBT, is a defined benefit pension plan available exclusively to members of the Teamster Union.  Lead Plaintiff purchased 16,570 shares of Obalon common stock at inflated prices during the Class Period.  *See* ECF No. 4, Ex. B.  Lead Plaintiff suffered economic losses when true facts about the Company's product and financial condition were disclosed and the artificial inflation was removed from the price of Obalon stock.

#### 2.   Exchange Act Defendants

84.   As aforementioned, Defendant Obalon is a Delaware corporation founded in 2008 with its principal place of business in this District in Carlsbad.  The Company's shares are traded on the NASDAQ stock exchange under the ticker symbol "OBLN."

85.   As aforementioned, Defendant Rasdal has been Obalon's CEO, President, and a director since June of 2008.  In this role, Rasdal spoke on Obalon's behalf during conference calls, in press releases, and in the media.  Rasdal works in this District at Obalon's headquarters.

86.   As aforementioned, Defendant Plovanic has been Obalon's CFO since March 2016.  In this role, Plovanic spoke on Obalon's behalf during conference calls, in press releases, and in the media.  Plovanic works in this District at Obalon's headquarters.

**B.    Additional Exchange Act Allegations**

    **1.    The Exchange Act Defendants Continued to Misrepresent the Obalon Balloon's Characteristics After the IPO**

87.    After the IPO, the Exchange Act Defendants continued to make false or misleading statements about the Obalon Balloon's characteristics, especially relative to the competition, by falsely proclaiming its superior ease of use, safety, and effectiveness.

88.    The Exchange Act Defendants described the Obalon Balloon's large and difficult-to-swallow pill as "just a standard pharmaceutical type capsule," which is "easy to place."  But the Exchange Act Defendants knew about the swallowing difficulties that patients experienced during the SMART study, and that these difficulties continued post-launch.  In January 2017, shortly after launch in the United States, Obalon quietly began offering a "swallow guarantee program," which obligated it to cover the cost of all balloons that patients could not swallow.

89.    The Exchange Act Defendants also continued to falsely tout the purported safety and comfort of the Obalon Balloon relative to the competition. Shortly after the U.S. launch, Defendant Rasdal downplayed the adverse effects of the product, claiming "there may be some minor discomfort for the first 24 hours."  This dramatically misrepresented the actual adverse effects of the product, which occurred in 90% of patients, and often lasted longer than two weeks.  Additionally, Rasdal lacked any support for the statement, as nothing from Obalon's SMART study indicated that symptoms dissipated in a single day.

90.    The safety of intragastric balloons drew national scrutiny on February 9, 2017, when the FDA issued a warning letter to health care providers asking them to "[r]ecognize that patients with implanted liquid-filled intragastric balloons may develop balloon-related symptoms or other abnormalities following the balloon placement, and throughout the duration of their treatment."

91.     Six months later, in August 2017, the FDA dropped a bombshell when it announced that five people had died from intragastric balloons.  Two of those deaths resulted from perforations in the digestive tract, and the cause of three was unknown but happened within days of the deceased's balloon placement.  Ten months later, in June 2018, the FDA reported seven more deaths from intragastric balloons, with four of the fatalities described as "gastric perforation."

92.     These deaths were from liquid-filled balloons, and the FDA never expanded the warning to include gas-filled balloons.  Nevertheless, the market grew wary about all intragastric balloons.  To allay the market's concerns, Obalon, Rasdal, and Plovanic made false or misleading statements about the differences between the Obalon Balloon and its liquid-filled competition.  On a February 23, 2017 conference call, for example, Rasdal falsely claimed that the Obalon Balloon has a "very different adverse event and patient discomfort profile" than liquid-filled balloons.  He reiterated this statement during a November 3, 2017 call, boasting about Obalon's "substantially different adverse event and ease of use profile."

93.     In reality, the Obalon Balloon's adverse events and patient discomfort were at best comparable to competitors and actually much worse in certain ways.  For instance, the clinical trials for each product revealed that the Obalon Balloon caused abdominal pain in 72.6% of patients, while Orbera and ReShape caused pain in only 57.5% and 54.5% of patients, respectively.

94.     Moreover, the Exchange Act Defendants made these assurances to investors without disclosing that the Obalon Balloon also caused gastric perforation – the root cause of half the reported intragastric balloon deaths.  In fact, before the IPO, a patient in the Middle East died when a balloon perforated the patient's esophagus and resulted in terminal sepsis.  Shortly after Obalon introduced its product in the United States, similar issues began to arise with U.S. patients.  During the Exchange Act Class Period, Obalon reported eight separate injuries from the Obalon Balloon devices, including:

- On July 25, 2017: "cratered gastric ulcers, one with pigmented material and bleeding."

- On July 27, 2017: "[l]arge 3 cm ulcer" and a balloon that had migrated to the colon.

- On December 11, 2017: "perforation in the stomach" and "a large 1.5 to 2 cm ulcerated crater in the upper stomach."

- On March 29, 2018: "[e]sophageal perforation."

The safety profile for the Obalon Balloon was thus not "very different" from competitors' profiles, as the Exchange Act Defendants claimed.

95.    The Exchange Act Defendants also made false or misleading claims about the Obalon Balloon's effectiveness and sustainability relative to the competition.  In Obalon's 2016 and 2017 Annual Reports, the Company criticized Orbera and ReShape for their "limited ability to provide progressive and sustained weight loss."  During a conference call in November 2017, Rasdal claimed that the Obalon Balloon is "different and the primary difference is because it works."  In January 2018, he boasted that the Obalon Balloon was "performing unlike anything that has been in the market before or is currently in the market."  These statements were false.  In reality, the Obalon Balloon resulted in significantly *less* weight loss than its competitors.  For example, Orbera, which controlled the majority of the intragastric balloon market, generated 46% more weight loss than the Obalon Balloon.

## 2.    The Exchange Act Defendants Made Materially Misleading Statements and Omissions About the Company's Sales

### a.    Sales Declined During the First Three Quarters of 2017

96.    Obalon's false or misleading statements about the characteristics and efficacy of the Obalon Balloon initially piqued interest from health care providers.  That interest grew when Obalon offered to conduct its own direct-to-consumer marketing, refrain from upfront payment, and list providers on a Company database to which prospective patients had access.  In effect, Obalon transferred all of the burden

1   and risk of a purchase to its side of the transaction – the providers just had to oversee

2   patients swallowing the capsules and collect their money.  As a result, the market was

3   initially receptive.

4         97.      By way of background, the Company sells Obalon Balloons to doctors

5   and other health care providers in two distinct ways:  "starter kits," which are sold

6   exclusively to new customers; and "reorder kits," which are sold exclusively to

7   returning customers who previously bought the starter kit.  Starter kits sell for $30,000

8   and contain 30 Obalon Balloons as well as permanent equipment needed to place the

9   Balloon, such as the external inflation system.  Reorder kits typically sell for $15,000

10   and contain 15 Obalon Balloons, but do not include the permanent equipment.  So,

11   even though the starter kit contains more product, both kits sell for $1,000 per balloon.

12         98.      Throughout the first year after its U.S. launch, Obalon reported revenue

13   generically, without reference to starter and reorder kit sales.  On March 5, 2018,

14   Obalon finally provided detail about its 2017 sales, and those sales figures revealed an

15   alarming trend.  For the first three quarters of 2017 ("1Q 2017," "2Q 2017," and

16   "3Q 2017"), Obalon's sales *declined* in several important ways.  U.S. revenues grew

17   slightly from 1Q 2017 to 2Q 2017, but then flattened from 2Q 2017 to 3Q 2017.  This

18   was a terrible result for a young company desperate for growth.

19         99.      Meanwhile, starter kits sales declined, revealing a lack of interest from

20   new clients.  In 1Q 2017, Obalon took advantage of the initial positive market

21   sentiment and sold 50 started kits.  Sales declined steadily over the next two quarters,

22   with the Company selling 46 starter kits in the second quarter and 38 in the third

23   quarter.  Reorder kit sales also disappointed.  The Company failed to sell more than 60

24   reorder kits in a single quarter, and sales were concentrated among only a few

25   interested customers.  For example, the Company sold approximately 50 reorder kits

26   in the first two quarters of 2017, and at least 18 of these (36%) went to a single

27   bariatric surgeon.

28

100.   During the first three quarters of 2017, health care providers stopped reordering Obalon Balloons as patient demand waned.  Obalon sales personnel noticed that less and less people wanted Obalon Balloons and regarded Obalon executives' optimistic tone about the product as smoke and mirrors.

**b.    Despite the Decline, the Exchange Act Defendants Touted the Company's Purported Success**

101.   Throughout the first three quarters of 2017, the Exchange Act Defendants used their vague revenue reports to conceal the truth about Obalon's declining business prospects.  In reporting Obalon's 3Q 2017 revenues, Defendants Rasdal and Plovanic reported that "[r]evenue in Q3 2017 was $2.8 million up 42% over Q2 2017."  Even if these numbers were technically accurate, they were misleading.  Indeed, as Rasdal acknowledged on a call with analysts, the Company resumed foreign sales to Bader in the third quarter.  These sales had not been present during the first two quarters of 2017 and accounted for *all* $0.8 million in purported growth during 3Q 2017.  Thus, as Defendants Rasdal and Plovanic failed to explain, crucial U.S. sales had *not* grown, but plateaued.  Obalon's misleading reports also failed to describe the concerning trends in starter kit sales and reorder kit sales.

102.   Obalon's refusal to provide more information about its earnings frustrated the market, and analysts noted that they needed more information to understand the Company's trajectory.  In June 2017, Northland wrote "it is unclear to us as to what number of accounts the [intragastric balloons] were sold to, what [average selling prices] were, how much of these were stocking orders, etc."  And in August 2017, Northland said "what remains unclear to us is . . . 1) What are initial stocking orders? 2) How many procedures have actually been completed?"

103.   Instead of answering these questions, the Exchange Act Defendants provided platitudes about the Company's growth.  During an earnings call on November 3, 2017, Rasdal reported:  "I'm impressed with our progress and continuing

to methodically build the foundation to establish an important new therapy for weight loss, and create a sustainable business franchise." He further claimed that Obalon was "performing as intended both in terms of clinical outcomes, and economically as a business."

104.   Obalon also drastically overstated doctors' interest in the product. During a conference call on May 10, 2017, Rasdal claimed "the commitment and the interest is very, very high." He reiterated this sentiment on November 14, 2017, calling the level of interest "astounding" and claiming that industry leaders were "amazed by this degree of interest."

105.   To bolster these claims, the Exchange Act Defendants touted the number of reorders that the Company received from existing clients, suggesting they had used up their initial orders and sought more.   During the 3Q 2017 earnings call on November 3, 2017, Rasdal claimed "[r]eorders from existing accounts in the U.S. grew again in Q3 2017 providing additional support that our strategy to create a foundation for sustainable revenue is beginning to take hold." On November 9, 2017, Rasdal again stated that, "since our launch, we've not only increased the number of accounts reordering.   We've increased the number of reorders [and] the overall volume of reorder revenue."

106.   These statements were false or misleading for a few reasons, including their failure to disclose the high concentration of reorder sales made to only a select few customers. For instance, one bariatric surgeon, Dr. Moses Sheih, placed balloons in 100 patients in the first two quarters of 2017.   Assuming Dr. Sheih ordered a starter kit and enough reorder kits to place three balloons in each patient, he ordered 300 balloons total, including 18 reorder kits. But Obalon only *sold* about 50 reorder kits in the first two quarters of 2017. So Dr. Sheih accounted for 36% of all reorder kits sold during this time period.   When analysts asked the Exchange Act Defendants about Dr. Sheih's reported numbers, they let investors believe his experience was typical, claiming his sales were impressive but likely "not the company's most active site."

107.   This trend of high concentration among a few health care providers remained throughout the Exchange Act Class Period.  In 1Q 2018, a single bariatric surgery practice saw approximately 60 patients and a single aesthetic practice saw 130 patients.  Together, these two providers accounted for 190 patients, and – at three balloons per patient – this translated into 570 balloons.  But Obalon only sold 500 balloons to all accounts during that quarter, which means that sales were dramatically concentrated to these two doctors for 1Q 2018 and the prior quarters.

108.   The Exchange Act Defendants concealed this high rate of reorder concentration, encouraging investors to believe that reorders were more evenly distributed across the customer base because of wide-spread acceptance of the product.  On May 10, 2017, Rasdal assured investors that interest among doctors was "very, very high."  Rasdal continued to encourage this belief toward the end of the Exchange Act Class Period when he explicitly told investors that the reorder numbers demonstrated industry-wide acceptance: "60% of our U.S. revenues were reorder business in the first quarter . . . .  So it shows you the underlying business is very healthy from that standpoint."

109.   Obalon also misrepresented its sales strategy and doctors' willingness to pay for balloons they did not use.  In earnings reports filed with the SEC on February 23, 2017, on May 10, 2017, and again on August 2, 2017, Obalon reported that it "recognizes revenue when . . . collectability is reasonably assured."  This too was inaccurate, however, as the Company would admit in its November 3, 2017 SEC filing that "we have experienced and may continue to experience the need to write off accounts receivable due to the inability to collect outstanding customer balances."

110.   Ultimately, analysts accepted Obalon's positive representations.  Underwriter Defendant UBS, which stood to profit off Obalon's inflated stock, stated in November 2017 that "[w]e continue to expect the long-term market opportunity to exceed $2 bil[lion], and view the clinical data and differentiated technology of the

Obalon system as sustainable drivers of adoption and market leadership in this new and attractive segment. Reiterate Buy."

### 3. The Accounting Scheme

#### a. The Exchange Act Defendants Launched a Promotional Campaign to Inflate 4Q 2017 Revenues

111. With sales steadily declining throughout 2017, and diversionary tactics wearing thin, the Exchange Act Defendants were desperate to boost the Company's numbers in 4Q 2017. Obalon rolled out an aggressive promotional campaign designed to convince health care providers to stock up on Obalon Balloons during that quarter, rather than buy them on an as-needed-basis in future quarters. As part of the promotion, Obalon agreed to take on additional obligations, some of which would occur in the distant future. For instance, for each customer who purchased a starter kit or a reorder kit, Obalon agreed to provide: (i) 100 patient leads from its database; (ii) "priority" access to these leads; and (iii) Obalon-funded rebates to patients who lost weight, which the health care providers could use to attract more patients. Obalon sent flyers to health care providers to advertise the deal:



112.    Obalon's campaign worked on the few remaining doctors with interest in the product.  These doctors bought extra product during the promotional period, rather than when they needed them.  As a result, Obalon enjoyed artificially inflated numbers in 4Q 2017, reportedly selling 55 starter kits and approximately 90 reorder kits.  Even these numbers were misstated, however, as the Company sold less starter kits than it reported.  When receiving their quarterly reports, Obalon sales personnel noticed that the Exchange Act Defendants misclassified some 4Q 2017 reorder kit sales as starter kit sales in order to misleadingly report increased interest from new customers.

113.    Meanwhile, Obalon's steady, contractually obligated sales to Bader continued from the third quarter.  In total, Obalon recorded $3.9 million in revenue for 4Q 2017, greatly exceeding every quarter before it.  As a result of the promotion, the Exchange Act Defendants successfully maintained the false public impression of a company on the rise, and concealed information about its declining sales for another quarter.

114.    Obalon rushed to flood the market with news about its artificially inflated 4Q 2017 performance.  Just five days into 2018, and months before it would normally report its quarterly earnings, Obalon provided its "preliminary unaudited revenue" for 4Q 2017.  The Exchange Act Defendants also went on a media blitz to tout the Company's success.  Rasdal released a statement to media outlets to proclaim that "'[t]he fourth quarter of 2017 was our strongest quarter to-date on many important metrics,'" including "'[s]ales to new accounts,'" and that "'2017 was a transformational year for Obalon.'"  Media outlets parroted Rasdal's message and lauded the Company's booming performance as "an estimated increase of approximately 400% over the fourth quarter of 2016."

115.    During a conference call on the same day, an analyst asked Rasdal pointedly "what sticks out in your mind that's driving new account growth over this past quarter . . . ?"  In response, Rasdal failed to mention the promotional scheme, the

1   faulty accounting, or the misclassification of reorder kit sales.  Instead, he falsely
2   attributed the higher numbers to "happy patients," "organic momentum," and the
3   attributes of the product.

4       116.   As would be expected, the market reacted positively to this news.  An
5   analyst from Underwriter Defendant Canaccord raved on a conference call that
6   "everything is going in the right direction" and then wrote in his report that the
7   Company's "continued momentum in physician utilization" was "critical to long-term
8   commercial success."  He concluded that "we encourage investors to focus on the
9   positive momentum of the underlying business as we head into 2018."

10       117.   While Obalon rushed to flood the market with news of its artificially
11   inflated 4Q 2017 financial performance, the Exchange Act Defendants hid the true
12   basis for these numbers.  They failed to inform investors that the revenues had been
13   inflated by sacrificing the performance of future quarters and by wrongly recording
14   revenues the Company had not yet rightfully earned.

15       118.   The Exchange Act Defendants also failed to disclose that the inflated
16   4Q 2017 revenues, which were reported in Obalon's January 5, 2018 press release
17   were in violation of the generally accepted accounting principles ("GAAP"), as
18   described below in ¶¶157-162.  The improper revenue recognition rendered Obalon's
19   financial results materially misstated, as described below in ¶¶163-167.

20         **b.**     **The Exchange Act Defendants Continue to**
21                **Deny Wrongdoing Even After an Insider Blows**
             **the Whistle**

22       119.   The Exchange Act Defendants' motivation for issuing a premature
23   financial report became clear within days of when they made it. On January 16, 2018,
24   Obalon announced that it would return to the public market with a secondary offering
25   seeking $35 million.  The offering was scheduled to close on January 23, 2018.  The
26   secondary offering materials repeatedly referenced the Company's "preliminary"
27   earnings, ensuring that the market believed "the fourth quarter [of 2017] was our

28

1   highest ever in terms of new patients starts, total balloons placed and the number of

2   accounts treating patients."

3       120.   Obalon's scheme unraveled, however, on the eve of the secondary

4   offering.   Late on January 22, 2018, an anonymous whistleblower from inside the

5   Company notified Obalon's independent auditors that the Company had committed

6   accounting fraud with respect to its purported 4Q 2017 earnings.  The whistleblower

7   specifically alleged that the Company improperly recognized revenue related to the

8   sales promotion described above.  In light of the whistleblower complaint, Obalon

9   cancelled its secondary offering and told the market it would investigate the claim.

10  The Company said the "Audit Committee will oversee an internal investigation of

11  these allegations" and that it would "make a further announcement regarding the

12  outcome of the Investigation as soon as practicable."

13      121.   A month later, the Exchange Act Defendants held a conference call and

14  denied all wrongdoing.  Defendant Plovanic stated that "the audit committee has

15  completed its investigation into [the] purported whistle-blower complaint and

16  concluded that the allegations in the complaint are without merit."   He assured

17  investors that "[p]reliminary revenues were not misrepresented and management did

18  nothing to mislead investors."

19      122.   But the Exchange Act Defendants' actions spoke louder than their words.

20  At the same time as Plovanic denied wrongdoing, he admitted that the "preliminary"

21  revenues had been substantially inflated, and warned investors that the numbers

22  "could change between 5-7%."  Less than two weeks later, on March 5, 2018, Obalon

23  released revised numbers that slashed earnings by $200,000 for 4Q 2017 alone.

24  Rather than earning $3.1 million in the United States, as the Company had previously

25  claimed, it conceded that it only earned $2.9 million, a material 6.5% correction.

26      123.   Defendant Plovanic admitted that the change related to the Company's

27  faulty accounting of the 4Q 2017 promotion.  Specifically, he represented that the

28  adjustment came from a "change in our calculations for promotion," "our decision to

1  extend the expiration of a sales promotion," and "our commitment to deliver a
2  minimum of 100 leads to accounts participating in our Q4'17 new year's promotion."
3  In doing so, moreover, Plovanic admitted that Obalon had prematurely reported
4  revenues that should have been attributed to the 1Q 2018: "We have deferred 147,000
5  of revenue from Q4'17 to 2018."  Rather than accept responsibility for the misstated
6  revenue, Plovanic told investors that "these types of adjustments are not unusual in the
7  final year-end audit."

8      124.   Even though Obalon had just admitted to inflating its 4Q 2017 numbers,
9  the Exchange Act Defendants encouraged investors to expect its performance to
10 continue into the future.  During a conference call discussing the results, Defendant
11 Rasdal assured investors, "[f]or the US, we are targeting revenue in a range of
12 12 million to 16 million."  This projection would require revenues of $3-4 million per
13 quarter, an improvement over its record-breaking 4Q 2017, in which the Company
14 earned $2.9 million.

15     125.   Given the Company's prior promises of growth, the market regarded
16 these numbers as attainable.  For example, Underwriter Defendant BTIG, which stood
17 to profit off of Obalon's stock, called the growth estimate "conservative" and told
18 investors "[w]e believe guidance is achievable and this could help shares over the next
19 year."

20 **C.   The Exchange Act Defendants Made Actionable Misrepresentations and Omissions**
21
22     **1.   Misrepresentations and Omissions Regarding the Product**

23     126.   Throughout the Exchange Act Class Period, the Exchange Act
24 Defendants misrepresented key characteristics of the Obalon Balloon, including its:
25 (i) ease of use; (ii) safety and comfort; and (iii) effectiveness.  The Exchange Act
26 Defendants repeatedly invoked comparisons to Obalon's competitors, Orbera and
27 ReShape, falsely claiming the Obalon Balloon was superior in these three areas.
28

127.   For example, during Obalon's Q3 2016 Earnings Call on November 11, 2016, Rasdal said:

> In addition to the ***strong safety and efficacy*** demonstrated in our U.S. pivotal trial that supported our FDA approval, we believe the Obalon Balloon offers many important ease-of-use advantages over prior and current gastric balloons to both providers and patients.
>
> First, by being swallowable, ***the Obalon Balloon is easy to place***. The patients simply swallow[] the capsule with the balloon inside without the need for anesthesia or sedation.  Placement does not require an endoscopic procedure under anesthesia like other gastric balloons. The simple placement enables balloon volume to be increased incrementally over the treatment period by simply swallowing up to two more up to additional balloon capsules up to a total of three balloons, which is intended to minimize side effects and create progressive weight loss over the full treatment period.
>
> Next, by being gas-filled, the balloon is light and floats up in the fundus, or the top of the stomach as opposed to sinking to the antrum or the bottom of the stomach like prior and current gastric balloons.  This is intended to be ***less offensive to the stomach to increase patient comfort and reduce the adverse that's seen with conventional liquid-filled balloons***.

128.   During a conference call at the Canaccord Genuity Medical Technologies & Diagnostics Forum on November 17, 2016, Rasdal said:

> So when we looked at this and we decided to start an endeavor into weight loss, we didn't invent the idea of the space occupying device for the idea of putting a balloon and what we've invented is a novel technology that creates first swallowable gas-filled balloon to what we believe ***solves the historic challenges where others have failed that unable to achieve the same level of access***.
>
> Our goal is to create a product, which is ***easy to administer*** both because of ease of use and convenes as well as the ability to keep it a low cost to be able to create meaningful and clinically relevant weight loss in patients ***without inducing a lot of side effects. And without the mechanism being so sick, making you so sick that you can't eat, but rather making you feel so full that you don't want to eat***, but it allows you to actually have a six month treatment where weight loss would be progressive over the full six months, not just for a period of time while you're sick and feeling horrible ***and then ultimately be able to maintain weight loss once the balloons were removed***.

1481554_1

So what we've ended up with as a balloon, which is put into a *swallowable standard gelatin capsule* with a little micro-catheter about the size of fishing line behind it. And easy to use handheld device, you simply hook that up to inflate the balloon, turn the valve, the balloon inflates and was left behind and the patients is a 250cc gas-filled balloon is light in weight, it lives in the top of the stomach or the fundus and you can talk to scientists, they'll talk to you about growing pathways, stretch receptor, in the end if you talk to patients who have the therapy, it makes them to feel so full, eat less, less calories, they lose weight.

I think the mechanism is literally that simple. *To place the product is very simple*. Patient simply comes in and swallows the capsule with a glass of water, no sedation, no anesthesia. Once it's in the stomach that catheter is hooked up to the backend of the – frontend of the inflation device. Turn the valve, the balloon is inflated. The catheter is ejected off the balloon once it reached full inflation and simply pulled out of the patient's mouth. The whole procedure takes less than ten minutes. There is no sedation, no anesthesia, patients' easy convenient.

\*     \*     \*

When the data was presented at DDW, we showed statistically significant improvement in metabolic profiles, fasting glucose, triglycerides, cholesterol and blood pressure were all statistically reduced and improved. We don't think again that's the major reason people choose to lose weight, but having health benefits accrue to that and being able to demonstrate that is of course important. And then finally we followed patients for six months after the balloons were removed and *we demonstrated that patients on average six months after the balloons were removed, one-year, maintained roughly 90% of the weight loss six months later*.

\*     \*     \*

This shows the balloon period for the first six months followed by the maintenance period where the balloons were removed and the patients were followed another six months. As you can see there [sic] *patients maintained 89.5% from the six months over the following six months*, I think it's particularly remarkable if you understand that the 24-week timing was the beginning of the Thanksgiving holiday in the U.S. Not many of us maintain our weight or don't gain weight between Thanksgiving and New Year, so again very strong performance. We certainly would like to believe that a lot of that is the mechanism rather than helping you lose weight because you can't eat because you feel so ill. We balance that we make you feel full, you eat smaller portions you do that over a full six-month period of time. It should make it more easy to maintain those habits once the balloons are removed.

\* \* \*

So in the end I think this is one of those **breakthrough technology** that offers ease of use and cost advantages that has the chance to create a category. We have strong – very strong clinical data that provides attractive economics both for patients and for the clinicians.

129. On January 27, 2017, during an interview as part of the NASDAQ CEO Signature Series, Rasdal said:

So there are **very minimal side effects**. We did a full randomized, sham controlled trial for FDA approval. Which we received in September [a]nd we only had a single serious adverse event in the entire study. **There is some minor discomfort. You are still putting something to make you feel full and so there may be some minor discomfort for the first 24 hours**.

\* \* \*

So the treatment is for six months from the time of the first placement. And it is as if you have three doses of a therapy, or of a medicine. You swallow the first capsule, **we create a balloon that makes you feel full without making you feel highly irritable and sick and nauseas** [sic], but about a month you start to feel a little less full as your body adapts. So there is no procedure, they simply swallow a second capsule, we now double the volume of the balloons. It fools the body into feeling it is full for about another two months. At the end of the third month, right? Two months later, they swallow a third capsule. They continue on for another three months at a total of six month and then the balloons are removed in a short outpatient procedure endoscopy under light conscious sedation.

130. In its 2016 Annual Report, filed on Form 10-K with the SEC on February 23, 2017, and signed and certified by Defendants Rasdal and Plovanic, the Company wrote:

We designed the Obalon balloon system to address many of the limitations of prior devices intended to treat weight loss, including traditional saline-filled intragastric balloons. We believe the Obalon balloon system offers patients and physicians benefits over prior weight loss devices including but not limited to: a favorable safety profile, improved patient tolerability and comfort, progressive weight loss with durable results, simple and convenient placement, and attractive economics for patients and physicians.

\* \* \*

Other approved traditional saline-filled intragastric balloons in the United States are the ReShape Duo Balloon and the ORBERA Balloon. While generally effective in delivering weight loss, these traditional saline-filled intragastric balloons have been accompanied by a number of limitations that have impeded their adoption, including: ***high rate of SADEs, lack of comfort and tolerability, limited ability to provide progressive and sustained weight loss***, and inconvenient placement procedure.

### OUR SOLUTION

We have developed our Obalon balloon system ***to overcome the limitations of prior devices*** intended to treat weight loss, including traditional saline-filled intragastric balloons. Based on our clinical data and commercial experiences, we believe the Obalon balloon system provides the following benefits to our patients and their physicians:

- ***Favorable safety profile***. In our pivotal SMART trial, only one of 336 (0.3%) patients that received our Obalon balloon experienced a SADE. As of December 2016, we had sold over 26,000 units of our earlier generation Obalon balloon systems in international markets with a minimal number of SADEs reported to us, none of which were required to be reported to the applicable foreign regulatory authorities. Our investigations determined that all of the international SADEs occurred in patients where the device was not used in accordance with approved labeling.

- ***Improved patient tolerability and comfort***. The Obalon balloon is inflated with a proprietary mix of gas. This creates a light, buoyant balloon that floats at the top of the stomach instead of sinking to the bottom of the stomach like a traditional saline-filled intragastric balloon. Further, the Obalon balloon system consists of three separate 250cc balloons placed individually over a three-month period to progressively add volume. We believe these design elements have the potential to improve patient comfort and tolerability of our Obalon balloon.

- ***Progressive weight loss with durable results***. In our pivotal SMART trial, patients in the Obalon treatment group lost, on average, approximately twice as much body weight as patients in the sham-control group. In addition, patients in the Obalon treatment group showed, on average, progressive weight loss over the balloon treatment period, which we believe is ***attributable to the individual placement of three separate Obalon balloons over the treatment period***. Subsequent data analysis at 12 months also showed that, on average, 89.5% of the weight loss was maintained six months after balloon removal.

- ***Simple and convenient placement***. The Obalon balloon is placed without anesthesia or an endoscopy through a swallowable capsule that dissolves in the stomach and releases the balloon. These unique features allow patients the flexibility to receive the Obalon balloon discreetly in an outpatient setting. Placement typically occurs in less than ten minutes and can be scheduled in the morning before work, during a lunch break or in the evening. Treated patients can return promptly to their normal daily activities. The balloons are removed endoscopically under light, conscious sedation six months after the first balloon placement.

131. Obalon held an earnings call on the same day that it filed the 2016 Annual Report, during which Defendant Rasdal said:

I think the thing that's a little bit different about this and may overcome some of the folks, let's do a few and wait and see, is of course the number of these accounts, some have prior experience with one of the two other commercially available balloons.

So, they know about being into balloon business, and the biggest advantage we offer right out of the gate is ***easier placement without a complex procedure***, and then ***a very different adverse event and patient discomfort profile***.

132. During a conference call at the Canaccord Genuity 37th Annual Growth Conference on August 9, 2017, Rasdal said:

***The procedure itself is about as easy and convenient as it can to place it***. The patient simply comes in and they swallow a capsule with a glass of water. There's no anesthesia, no sedation. Once it's in the stomach, we hook the catheter up to that handheld inflation device, turn the valve, the balloon fills. We then eject the catheter and simply pull it out of the patient.

133. During that same conference call, Rasdal said:

We see patients actually coming in before work in that sort of 7:00 a.m. to 9:00 a.m. period getting a balloon placed and then going off to work. ***And because the side effects of this are very different than any other space occupying device. We don't get this nausea, the vomiting, the debilitating reaction to a very large and heavy device***.

Patients go about their normal activities, that being said we know from studying the categories, that came in. One of the things that happened previously with other heavy like liquid filled balloons or space occupying devices is that the patient could fight through that terrible period of intolerance that then the body would learn to adapt. It is a

foreign body type response, in that weight loss would start to plateau if they could get through that period of time.

134.   And during that same conference call, Rasdal said:

And I will tell you very candidly the top three reasons people want to lose weight are to look better, to look better, and to look better.  The truth is people don't go to lose weight to improve their health that's a byproduct.  But in terms of adoption, in terms of regulatory approvals we did demonstrate clear clinical benefit.

And then ***there's often this perception in previous space occupying devices showed once you remove the balloons there's a fairly rapid regain of weight***.  And as this slide shows this is the full, first six months of weight lost, which is what the – during the therapy period, the FDA asked us to report on. And the endpoints were designed around although, the FDA didn't require us to do so, once the balloons are out, we follow the patients for another six months to understand the maintenance or the durability of the type of weight loss this creates.

So two things, which had never, when this was presented both at ObesityWeek and in DDW, the largest GI meeting, two things had never been seen with the space occupying device as you can see the first six months, there's a continual progress of the weight loss over the full six month period.  Previous studies had showed about two months of weight loss and then plateauing.

Patients were still losing weight on average at the end of the period.  We took the balloons out at week 24 as you can see. And then followed those patients.  And on average, ***people maintained about 90% of their weight loss, which is a first ever that kind of durability in weight loss***.  It is even more remarkable, if you know that week 24 coincides with the beginning of the Thanksgiving holiday and in this country it is pretty hard to get weight loss between Thanksgiving and New Year's for most of us.

135.   On November 9, 2017, during a conference call at the Canaccord Genuity Medical Technologies & Diagnostics Forum, Rasdal said:

And as we look at or we're trying to think that ultimately the reason for the devices that have failed in obesity is even if they could generate scientific data and regulatory approvals, they simply didn't work.  And the problem is that if you have a product or technology, which is fundamentally doesn't work, look I said do over.  And the most important thing is to have a bonafide technology and product to move forward.

*We believe it's different and the primary difference is because it works*.  Obviously with a rigorous PMA approval process, we ran the most rigorous or clinical trial design, a large double-blinded randomized sham-controlled trial.  The data from that was very strong, yet had PMA approval and record time, only eight months.  The safety data has been unparalleled for a device in obesity is extremely strong.  We had strong weight loss, almost two times the weight loss in the people receiving the balloon as those who have received the placebo or the sham control. We demonstrated metabolic improvement.  We demonstrated almost 90% weight loss maintenance six months after the balloons removed.  So the scientific data was very compelling.  We said on our earnings call last Friday is that we have been collecting very proactively a large amount of commercial data in our commercial registry program.

136.    During the first 4Q 2018 Earnings Call on January 5, 2018, Rasdal said, "I continue to be very pleased with both the clinical and technical performance of this product. *I think it's performing unlike anything that has been in the market before or is currently in the market* and that continues to be encouraging."

137.    In the 2017 Annual Report, filed with the SEC on Form 10-K on March 5, 2018, and signed and certified by Defendants Rasdal and Plovanic, the Company repeated the misrepresentations from the 2016 Annual Report:

Other approved traditional saline-filled intragastric balloons in the United States are the ReShape Duo Balloon and the ORBERA Balloon.  While generally effective in delivering weight loss, these traditional saline-filled intragastric balloons have been accompanied by a number of limitations that have impeded their adoption, including: *high rate of SADEs, lack of comfort and tolerability, limited ability to provide progressive and sustained weight loss, and inconvenient placement procedure*.

*OUR SOLUTION*

We have developed our Obalon balloon system to *overcome the limitations of prior devices* intended to treat weight loss, including traditional saline-filled intragastric balloons.  Based on our clinical data and commercial experiences, we believe the Obalon balloon system provides the following benefits to our patients and their physicians:

- *Favorable safety profile*.  In our pivotal SMART trial, only one of 336 (0.3%) patients that received our Obalon balloon experienced a SADE.  As of December 31, 2017, we have had a minimal number of SADEs reported to us in commercial use with a rate no greater than experienced in the trial.

- ***Improved patient tolerability and comfort***.  The Obalon balloon is inflated with a proprietary mix of gas. This creates a light, buoyant balloon that floats at the top of the stomach instead of sinking to the bottom of the stomach like a traditional saline-filled intragastric balloon.  Further, the Obalon balloon system consists of three separate 250cc balloons placed individually over a three-month period to progressively add volume.  We believe these design elements have the potential to ***improve patient comfort and tolerability*** of our Obalon balloon.

- ***Progressive weight loss with durable results***.  In our pivotal SMART trial, patients in the Obalon treatment group lost, on average, approximately twice as much body weight as patients in the sham-control group.  In addition, patients in the Obalon treatment group showed, on average, progressive weight loss over the balloon treatment period, which we believe is ***attributable to the individual placement of three separate Obalon balloons over the treatment period***.  Subsequent data analysis at 12 months also showed that, on average, 89.5% of the weight loss was maintained six months after balloon removal.  Based on 2017 data collected in our commercial registry, the average weight loss per patient appears to be trending favorably in U.S. commercial usage versus the SMART trial.

- ***Simple and convenient placement***.  The Obalon balloon is placed without anesthesia or an endoscopy through a swallowable capsule that dissolves in the stomach and releases the balloon. These unique features allow patients the flexibility to receive the Obalon balloon discreetly in an outpatient setting.  Placement typically occurs in less than ten minutes and can be scheduled in the morning before work, during a lunch break or in the evening. Treated patients can return promptly to their normal daily activities.  The balloons are removed endoscopically under light, conscious sedation six months after the first balloon placement.

138.  These statements of fact were materially false or misleading and/or omitted material facts about the Obalon Balloon's ease of use, safety and comfort profile, and effectiveness.  In particular, the Exchange Act Defendants knew or recklessly disregarded that:

(a)   For ease of use:

(i)   the Obalon Balloon pill was not a "standard gelatin capsule" that was "very simple," "convenient," or "easy to use."  In reality, the clinical trials

1    and subsequent experience demonstrated that the pill was impossible to use for a

2    substantial amount of people because they could not swallow it; and

3                    (ii)    placement of the Obalon Balloon required patients to

4    undertake unique additional difficulties, such as swallowing multiple pills and

5    undergoing multiple x-rays of the abdomen, and also skipped the precautionary

6    gastrointestinal scan that other products afforded patients with the initial endoscopy.

7            (b)    For safety and comfort:

8                    (i)    the side effects were not "very minimal" or "very different

9    than any other space occupying device" because 90% of patients experienced adverse

10   effects, most patients experienced nausea just like patients of other devices, and

11   Obalon patients actually experienced *more* abdominal pain than its competitors'

12   patients;

13                   (ii)    the side effects did not amount to "some minor discomfort

14   for the first 24 hours," but rather significant ailments that often lasted longer than two

15   weeks; and

16                   (iii)   like the patients of its competitors, Obalon patients risked

17   serious conditions such as ulcers and perforations.

18           (c)    For effectiveness:

19                   (i)    the Obalon Balloon was not "performing unlike anything

20   that has been in the market before" and was not "differen[t] because it works" as the

21   clinical trials demonstrated that Obalon Balloon was actually 46% less effective than

22   Orbera; and

23                   (ii)    the "progressive and sustained weight loss" observed during

24   the SMART study was not scientifically attributable to the product itself, and instead

25   occurred because the patients in the study received free dietary counseling following

26   balloon removal.

27

28

## 2. Misrepresentations and Omissions Regarding the Company's Success During the First Three Quarters of 2017

139. During the first three quarters of 2017, and the first three quarters since Obalon launched in the United States, its business declined steadily.  The Company's U.S. business saw declining sales of starter kits, high concentration in sales of reorder kits, and flattening revenues.   In the face of these trends, the Exchange Act Defendants made false or misleading statements about its sales and industry interest that failed to disclose material facts about the Company's financial condition.

140. For example, during the 1Q 2017 Earnings Call on May 10, 2017, Rasdal said:

> I think [every health care provider] that again, it's a pretty discrete group, [every health care provider] that we targeted as we said, *the commitment and the interest is very, very high.  So it's not as that these people make purchase and then sort of lose interest. I think all of them committed*, I think that's too, we certainly as a Company and our people in the field have learned a lot in the first three months about how to get an account up and running more expeditiously.

141. On August 2, 2017, during the 2Q 2017 Earnings Call, Rasdal said:

> I think the overall response and the revenue that generated, I – it's only one quarter of comparisons, but look *I'm pleased that we had the percentage of reorder we do*.  As Bill mentioned that essentially the growth from quarter-to-quarter is driven by reorders, not simply new stocking orders.  And so I think that's an encouraging sign, but we're only one quarters of comparison either, we'll obviously try to grow both of those things in the next quarter.

142. During the 3Q 2017 Earnings Call on November 3, 2017, Rasdal lauded the Company's progress during the first three quarters of the year:

> I'm impressed with our progress and continuing to methodically build the foundation to establish an important new therapy for weight loss, and create a sustainable business franchise.  We continue to be pleased with the product performance and clinical outcomes of our unique swallowable gas-filled balloon in actual commercial use compared to the results from our controlled pivotal clinical trial, and especially compared to the older technology endoscopically placed liquid filled balloons.

Based on our registry data, and customer feedback since U.S. launch, we have increased confidence, we have a novel technology solution that is ***performing as intended both in terms of clinical outcomes, and economically as a business*** [indiscernible] is making the commitment to provide Obalon.

\* \* \*

Revenue in Q3 2017 was $2.8 million up 42% over Q2 2017, and up 260% over Q3 2016.  We made our first ever international shipments of our six-month balloon to our Middle East distributor. ***Reorders from existing accounts in the U.S. grew again in Q3 2017 providing additional support that our strategy to create a foundation for sustainable revenue is beginning to take hold***.  New patient starts and total balloons placed also grew in Q3 2017.

143.   On November 14, 2017, during a conference call at the Stifel Healthcare Conference, Rasdal said:

It's certainly our goal to continue to open a new account in a measured way.  We continue the learning, we continue the growth, we make it more accessible.  However, we said in both Q2 and Q3, essentially ***all of the growth in the U.S. has come from reorder business, in each of those quarters we've seen the number of reorders increase, the number of accounts reordering, the volume of the reorders and the overall revenue for reorders continue to increase***.  Albeit, only nine months into it or three quarters, it appear to be the strategy to make it sticking is mostly working that's our emphasis. But in order to reach more patients, we will expand more centers.

144.   On the same call, Rasdal had the following interaction with an analyst about the industry's interest in the Obalon Balloon:

[Analyst:]  What do you know today or what do you think are the most important things that have changed about your understanding of the market or the opportunities that you didn't know in January?

\* \* \*

[Rasdal:] ***It's astounding***, people like David Moatazedi, who's President of Allergan Aesthetics; you have Jonah Shacknai, who founded Medicis.  ***Even in their world they are amazed by this degree of interest***.  I don't know if that's explainable, but will take it, I think people are that desperate.  I think what we – the adoption into the aesthetic channel so quickly has been interesting.  Sono Bello seeing this, I think, that allows us to reach more patients and build a sustainable business.

145.   These statements of fact were materially false or misleading and/or omitted material facts about Obalon's financial condition.  In particular, the Exchange Act Defendants knew or recklessly disregarded that:

(a)   industry interest was  not "astounding" or "very, very high" because starter kit sales had declined every quarter from 1Q 2017 through 3Q 2017;

(b)   trends for reorder kits sales did not demonstrate a "foundation," but disproportionate interest among only a few health care providers – most accounts were not reordering at all;

(c)   the young Company had stopped growing after its second quarter of operations in United States, as domestic sales were flat sequentially from 2Q 2017 to 3Q 2017; and

(d)   the declining sales derived from declining interest from health care providers and patients.

146.   Obalon also misrepresented the collectability of its reported sales and doctors' willingness to pay for balloons they did not use.  In the earnings reports filed on Forms 10-K and 10-Q with the SEC on February 23, 2017, May 10, 2017, August 2, 2017, November 3, 2017, and March 5, 2018, each of which was signed and certified by Rasdal and Plovanic, Obalon reported that "[t]he Company recognizes revenue when (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred, (iii) the selling price is fixed or determinable and (iv) *collectability is reasonably assured*."

147.   These statements of fact were materially false or misleading and/or omitted material facts about Obalon's revenue recognition.  In particular, the Exchange Act Defendants knew or recklessly disregarded that it recognized revenue upon delivery to doctors and before they paid or collectability was reasonably assured. The Company would later admit "we have experienced and may continue to experience the need to write off accounts receivable due to the inability to collect outstanding customer balances."

### 3.     Misrepresentations and Omissions Regarding 4Q 2017 Sales

148.    After Obalon inflated its 4Q 2017 revenues with an aggressive promotion and falsified accounting, the Exchange Act Defendants made false or misleading statements about the actual financial condition of the Company and its ability to sustain the numbers it reported.  For example, during a conference call announcing the Company's "preliminary" 4Q 2017 results on January 5, 2018, Rasdal said:

> **2017 was a transformational year for Obalon**, and I'm very pleased with the success we have achieved at Obalon in our first year of US commercialization.  **We grew the business over the full year and finished with a strong Q4**.  For the fourth quarter, preliminary unaudited revenue was approximately 3.9 million, up approximately **400%** from 772,000 in the fourth quarter of 2016.  **Preliminary unaudited US revenue was approximately 3.1 million, an increase of over 50% from the 2 million in Q3 '17**.  Overall, preliminary unaudited revenue for the full year 2017 is expected to be 10.1 million, up roughly 200% from the 3.4 million in 2016.
>
> Perhaps, even more encouraging was the continued improvement in several areas we believe are important for growing a sustainable franchise over the long term.  In the US, **Q4 '17 was our highest quarter ever for new account sales, reorders from existing accounts were the highest of any quarter to-date, and for the first time, reorder revenues exceeded revenues from new account sales in Q4 '17**.  According to our commercial registry, Q4 had the highest number of new patient starts, the greatest number of balloon placements and the largest number of accounts treating patients of any quarter to-date.
>
> *          *          *
>
> **We are very encouraged with the revenue and patient volume performance in Q4'17**, and it was slightly counter to our belief that interest in seeking weight loss treatment would slow substantially over the holiday period.  While patient demand was the highest of any quarter in 2017, we believe some accounts may have purchased ahead in anticipation of higher patient demand associated with the new year.  As you would expect, we are running a New Year's resolution weight loss promotion.  **At this time, we are not able to project what impact these dynamics will have on new account sales or reorder volume in Q1'18**.
>
> *          *          *
>
> The current market for the Obalon Balloon System is in its infancy in terms of development.  We are encouraged by our progress and level

of commercial success in our first full year of US sales. ***Our experience continues to reinforce our belief that there is significant interest in the unique Obalon swallowable gas filled balloon because it solves a very large and important problem and provides for strong economic outcomes to providers***. We will continue to make the investments we believe are required to develop the market to its potential and create us valuable and sustainable business franchise. I continue to be very optimistic about the future for Obalon.

149. Later in the same call, Plovanic said:

In terms of seasonality, I go back to our comments on last quarter's conference call, or Andy [Rasdal]'s comments of, we didn't know what the back half of the quarter would look like and we were pleasantly surprised it was very strong, and fourth quarter was our strongest month – our strongest quarter. ***I just can't predict what Q1 is going to look like***. Typically, Q1 is very solid for patient flow, but we need the accounts to continue to treat patients. So we'll be monitoring this, but I can't provide you any guidance on what that's going to look like at this point in time.

150. On the same call, Rasdal had the following interaction with an analyst:

[Analyst:] [W]hat sticks out in your mind that's driving new account growth over this past quarter that really stuck out the physicians, if you could pinpoint something?

[Rasdal:] I think anecdotally, as we go in, it's one in terms of the accounts that have had experience now, ***they have happy patients***. We didn't have any adverse events or significant intolerance or system reactions, which I think was encouraging. ***The ease of use, the convenience that the product offers enables them to make it efficiently incorporated into their practice***. And I think increasingly, those ***customers are pleased*** with their financial outcomes from this – from the Obalon product.

I think for new customers, I think we're getting to a point now where we're starting to get some momentum, where the existing customers are starting to talk about their successes and that's flowing out now to the new account acquisition. I don't want to take anything away from the hard work of our executive account managers in getting new accounts. But I think ***this is now creating some sort of organic momentum*** that within each of the specialties, they're sharing some of their positive experience and that's helping us to move it forward.

151. On the same day, Rasdal told media outlets:

***2017 was a transformational year for Obalon***. The Obalon Balloon System was launched in the U.S. in January 2017 and we have

continued to grow the business.  The fourth quarter of 2017 was our strongest quarter to-date on many important metrics.  Sales to new accounts were the highest yet and, for the first time, reorder revenues from existing accounts exceeded revenue from new account sales. Based on our commercial registry, we believe the fourth quarter was our highest ever in terms of new patients starts, total balloons placed and the number of accounts treating patients.  We continue to believe we are implementing in a manner to build a sustainable franchise.

152.   These statements of fact were materially false or misleading and/or omitted material facts about Obalon's financial condition.  In particular, the Exchange Act Defendants knew or recklessly disregarded that:

(a)     2017 was not "transformat[ive]" in a positive sense, as the concealed numbers showed the young Company already on the decline;

(b)     the Company violated GAAP to inflate 4Q 2017 revenues;

(c)     revenues had not increased because of the product but because of the Company's aggressive promotion that inflated 4Q 2017 revenues and negatively impacted future quarters; and

(d)     starter kit sales had not increased because of "happy patients," "organic momentum," or the attributes of the product, but because of the Company's aggressive and unsustainable promotion and its misclassification of sales, including reorder kit sales as starter kit sales.

### 4.     Misrepresentations and Omissions About the Company's Financial Condition at the Start of 2018

153.   As 1Q 2018 drew to a close, the Exchange Act Defendants knew that its earnings for the quarter demonstrated a continued decline for the Company and were negatively impacted because of the fraud committed to inflate 4Q 2017 financials. Nevertheless, the Exchange Act Defendants kept this information secret and continued to promote the Company's prospects.

154.   During the 4Q 2017 Earnings Call on March 5, 2018, which occurred toward the end of 1Q 2018, the Company's worst quarter ever, Rasdal said:

As we previously stated on our last call, January 5th, we are running a New Year's weight loss promotion that began in Q4 and was intended to drive continued growth into Q1, in new patient treatments and the number of accounts treating. ***Based on the data from our registry in the US, this trend continues with the first two months of Q1 each recording the highest number of new patient start since launch***.

We are pleased with the impact of this program, thus far. However, as we previously cautioned, although patient demand has continued to grow into the first part of Q1'18, we believe that some accounts may have purchased ahead in Q4'17 in anticipation of higher patient demand associated with the new year promotion.

Additionally, our quarterly revenues have become increasingly back-end loaded. Thus, ***at this time, we're not able to project what impact these dynamics will have on new account sales, reorder volumes or revenues in Q1'18***.

155.  On the same call, Plovanic said:

Today, we are providing annual global revenue guidance for 2018, in a range of 14 million to 18 million. ***For the US, we are targeting revenue in a range of 12 million to 16 million*** and for international, we are targeting revenue in a range of 2 million to 4 million.

156.  These statements of fact were materially false or misleading and/or omitted material facts about Obalon's financial condition.  In particular, the Exchange Act Defendants knew or recklessly disregarded that, despite the fact that 1Q 2018 was nearly over:

(a)  there was no positive "trend," as the Company's sales had declined from the outset;

(b)  the Company was "able to project" poor sales for 1Q 2018 because it had already gutted a quarter of its revenue; and

(c)  sales would not be anywhere close to the $3-4 million the Company projected on a quarterly basis.

1

**D.      Obalon's False Financial Reporting**

2

    **1.      Obalon's 4Q 2017 Revenue Violated GAAP**

3
4
5
6
7
8
9
10
11
12
13
14
15

    157.    On January 5, 2018, Obalon reported that it had earned $3.9 million of revenue for 4Q 2017. Obalon's reported revenue figure was materially overstated and violated GAAP. As part of its aggressive 4Q 2017 sales promotion, Obalon promised to deliver a list of 100 patient leads to each health care provider customer who purchased a starter kit or a reorder kit. Because these patient leads had significant value to customers, and were to be delivered on a go-forward basis rather than at the time of the product sale, the lead lists represented a future performance obligation under GAAP and the product sales constituted "multiple-element arrangements" under GAAP. Obalon was required under GAAP to allocate some of the revenue associated with each sale of a starter kit or a reorder kit to the future delivery of patient leads and to defer that portion of the revenue until those leads were delivered to customers. Obalon violated GAAP in Q4 2017 by failing to allocate and defer an appropriate amount of revenue associated with the delivery of patient leads in subsequent quarters.

16
17
18
19
20

    158.    The SEC's Codification of Staff Accounting Bulletins Topic 13: Revenue Recognition, details the applicable GAAP for "revenue arrangements [that] contain multiple revenue-generating activities." The SEC directs companies to follow Financial Accounting Standards Board Accounting Standards Codification Topic 605 ("ASC 605"), which states:

21
22
23
24

        To meet their customers' needs, vendors often ***provide multiple products, services***, rights to use assets or any combination thereof. These vendors transfer the deliverables to the customer and ***performance may occur at different times or over different periods of time***, and the customer's payments for these deliverables may be fixed, variable, or a combination of fixed and variable.[2]

25
26
27

---

28

[2]    ASC 605-25-05-2.

159.   GAAP requires that companies determine "whether the arrangement should be divided into separate units of accounting" and "how the arrangement consideration should be measured and allocated among the separate units."[3]

160.   Specifically, ASC 605-25-25 §§4, 5 states:

A vendor shall evaluate all deliverables in an arrangement to determine whether they represent separate units of accounting.  That evaluation shall be performed at the inception of the arrangement and as each item in the arrangement is delivered.

***In an arrangement with multiple deliverables, the delivered item or items shall be considered a separate unit of accounting*** if both of the following criteria are met:

a.   The delivered item or items ***have value to the customer on a standalone basis***.  The item or items have value on a standalone basis if they are sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), this criterion does not require the existence of an observable market for the deliverable(s).

\*        \*        \*

c.   If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item or items is considered probable and substantially in the control of the vendor.

161.   In regards to allocating revenue to the multiple deliverables, ASC 605-25-25-2 requires that: "consideration shall be allocated among the separate units of accounting based on their relative selling prices."

162.   Obalon's sales to customers in Q4 2017 represented a multiple element arrangement under GAAP because the arrangement included the delivery of Obalon's product ***and*** a commitment to deliver a minimum amount of "leads" to each customer. The Exchange Act Defendants clearly understood that the patient leads had value to customers and served as a significant incentive as part of the Q4 2017 sales promotion.  Obalon, however, violated the GAAP and SEC rules described above by

---

[3]   ASC 605-25-25-1.

failing to properly allocate and defer an appropriate amount of revenue associated with the patient lead lists.  As detailed above, on March 5, 2018, the Company acknowledged its improper revenue recognition and restated and corrected its Q4 2017 revenue:

> As a reminder, we pre-announced unaudited preliminary revenues for Q4'17 of 3.9 million globally, 3.1 million in the US and full year 2017 revenues of 10.1 million.  The difference between our pre-announced preliminary, unaudited revenues and our final audited Q4'17 and full year 2017 revenues primarily consist of an additional revenue deferral from Q4 2017 to 2018 that was in addition to our original revenue deferral estimates at the time we provided unaudited preliminary revenues.

> Although the difference in our final audited versus first preliminary unaudited revenues was only approximately 5.6% of Q4 '17 revenues and 2% of full year 2017 revenues, and these types of adjustments are not unusual in the final year-end audit, I want to provide the full details of all adjustments. We have deferred 147,000 of revenue from Q4 '17 to 2018.

> We expect to recapture most of that deferral in Q1'18. 144,000 of that deferral related to our commitment to deliver a minimum of 100 leads to accounts participating in our Q4'17 new year's promotion.

### 2.    Obalon's Revenue Overstatement Was Material

163.   SEC Staff Accounting Bulletin No. 99 – Materiality ("SAB 99"), now codified at ASC 250-10-S99, states:

> Materiality concerns the significance of an item to users of a registrant's financial statements.  A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important.

164.   GAAP and Public Company Accounting Oversight Board ("PCAOB") Standards, including ASC 250-10-S99 set forth the framework for assessing the materiality of accounting misstatements.  Under GAAP, an assessment of materiality requires an evaluation of both quantitative and qualitative factors.[4] The evaluation of qualitative factors is an integral component of a materiality analysis.  Indeed, the SEC

---

[4]    ASC 250-10-S99; AS 14.17.

Staff has stated that qualitative factors may render a quantitatively small misstatement material or render a quantitatively large misstatement immaterial.[5]

165.   Obalon's overstatement of revenue in Q4 2017 was both quantitatively and qualitatively material.   From a quantitative perspective, Obalon's Q4 2017 revenues were overstated by over 5%, including an overstatement of 4% associated with the failure to defer revenue associated with patient lead lists, as described above.

166.   Further, Obalon's Q4 2017 revenue misstatement met the following qualitative materiality factors identified in SEC SAB 99:[6]

| SAB 99 Factor |
| --- |
| "[W]hether the misstatement masks a change in earnings or other trends." |
| "[W]hether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise." |
| "[W]hether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." |
| "[W]hether "management has intentionally misstated items in the financial statements to 'manage' reported earning" . . . to affect "amounts and trends [that] would be significant to users of the registrant's financial statements." |

167.   Consequently, using the framework set forth in GAAP, Obalon's overstatement of revenue in Q4 2017 was quantitatively and qualitatively material.

**E.    The Truth Begins to Emerge**

168.   In a series of partial disclosures throughout the Exchange Act Class Period, investors learned the truth about the Obalon Balloon and the Company's financial condition and performance.   As a result, the stock dropped, as visually shown below, from the $15.00 IPO price to under $3.00 today.

---

[5]   Todd E. Hardiman, Associate Chief Accountant, SEC Division of Corporation Finance, *Remarks before the 2007 AICPA National Conference on Current SEC and PCAOB Developments*, Speech by SEC Staff (Dec. 11, 2007).

[6]   ASC 250-10-S99.

**1.      The Northland Report**

169.    Before June 21, 2017, investors had only heard positive reports from the analysts.   The same four companies that underwrote Obalon's IPO repeatedly recommended that investors "BUY" Obalon stock.   For example, on October 31, 2016, Underwriter Defendant UBS wrote that the Obalon Balloon had a "[s]uperior adverse event, patient tolerability and durability profile" and would lead to "a new market exceeding $2 bil over time."   And on May 17, 2017, Underwriter Defendant Canaccord said:

> Longer term, we believe the biggest opportunity for Obalon comes from the potential to gain share and expand the market into the aesthetics and plastic surgery community.   We believe this opportunity is unique to Obalon given there is no need for an endoscopic procedure for implantation and the improved patient tolerability and safety relative to the competition. . . .

170.    On June 21, 2017, Northland issued a detailed 55-page report that, for the first time, provided an in-depth, third party critique of the Company's representations about the Obalon Balloon's characteristics.   *See* Exhibit B.   In the report, Northland

reported new analysis of the SMART study results from the FDA database and compiled and reported new analysis about information from other scientific papers, journals, and blogs.  The report concluded that Obalon's stock price was "too high" and revealed that the Company had misrepresented the product's ease of administration, enhanced safety, and superior effectiveness.

171.   Northland disclosed the difficulties patients experienced when attempting to swallow the device, and questioned patients' desire to return more than once:

> The SMART trial showed that 8% of patients could not swallow the pill, the patients who had 1 IGB [Intragastric Balloon] lost about 2 lbs @ 6-mths, those with 2 balloons lost approx. 3 lbs, and those with 3 balloons lost approx. 15 lbs @ 6-mths. . . .   How do you ensure patient compliance in coming back for multiple balloon procedures?"

Northland also expressed concern about the placebo pill screening test: "The need for trialing a pill swallowing attempt prior to actual delivery of the IGB presents logistical hurdles to patients.  To lose 6.6% TWL, one has to ask the question . . . is the procedure and the cost worth it?"

172.   Northland also informed investors about Obalon's inferior results concerning safety and comfort, noting that the SMART study showed "[a] significant percentage of subjects experienced adverse device effects such as abdominal pain, nausea, and vomiting."  The report posted a chart comparing Obalon with Orbera and ReShape, which it created based on a blog from the Mexico Bariatric Center and a recent *Gastroenterology* article.  The chart showed that Obalon caused all the same adverse effects as its competitors, and actually caused significantly ***more*** abdominal pain.  According to the chart, 72.6% of Obalon patients experienced pain, while Orbera and ReShape caused pain in only 57.5% and 54.5% of patients respectively.

173.   For efficacy, Northland compiled a chart showing that the Obalon Balloon proved less effective than its competitors' products, causing less weight loss over a six-month period in terms of both excess weight loss ("EWL") and total weight loss ("TWL").  The chart included the following information:

|  | EWL | TWL |
|---|---|---|
| **Orbera** | 38% | 10% |
| **ReShape** | 28% | 8% |
| **Obalon** | 25% | 7% |

Northland warned that this poor performance would limit Obalon's ability to gain market share:

> One of two things has to happen [for Obalon to justify its stock price] either the IGB penetration has to ramp up very rapidly from here on, or Apollo has to start losing share rapidly.  The latter point is a little difficult for us to reconcile given that Obalon's weight loss is about 40% lower than Orbera's for the same time frame. Even if a patient agrees to come in for an intragastric balloon, we find it hard to reconcile how a doc would push them to do an Obalon vs. Orbera IGB, how the logistics of 3 procedures vs. 1 would work, and how the doc would convince the patient based on the relative data sets and experience levels with both IGB.

174.   Based on its research and a detailed medical analysis, Northland also questioned Obalon's claim of "sustainable" weight loss after the balloon removal. Northland noted that, under normal circumstances with an intragastric balloon, "weight regains after removal" and that "the science is unclear" in support of Obalon's purported fix of this problem.  Northland explained in detail its reasons for doubting Obalon's claim of sustainability:

- "[M]uch has been said about 'the 89% of patients "maintaining weight loss out to 12-months" with Obalon.'  In our view, this 'observation' should be taken for what it's worth . . . an observation. ***There cannot be any clinical inferences, especially when we don't understand how the little weight loss occurs in the first place***."

- "Commentary about the 89% of patients 'maintaining weight loss out to 12-months' with Obalon ***does not mean anything clinically***, in our opinion.  The key reason being . . . the MOA of action of Obalon is not understood and the weight loss maintenance after IGB removal was observational in nature."

- "While much has been made about the 89% weight loss maintenance after the 24-week time period, it is unclear to us if there is a clinically meaningful interpretation of this . . . .   Reason being: 1) this was an observational analysis, so not sure how much of this is chance; 2) the

proposed MOA for Obalon is not clear to us, hence to opine of the weight loss maintenance does not make much sense to us also."

175.   Based on its findings, Northland determined that Obalon's stock price was worth **half** as much as its selling price, reasoning:

Obalon, in our view, is entering this space, with very high expectations from a Wall Street perspective.  Our analysis of the clinical data shows that the 15 lb. weight loss seen from a baseline of 216 lb. weight "might" not be enticing enough for patients en masse to fork out $8,000 - $9,000 for this procedure, especially if it is not durable.  The relatively meager weight loss shown with the 6-month Obalon balloon, combined with the high costs of the procedure make this a smaller target opportunity than is currently appreciated.  We want to make it clear . . . there are always tradeoffs in obesity. There is no silver bullet of one technology curing everything.  Hence, one needs to factor in the risk benefit profile of various obesity interventions.  We have been generous in our assumptions on Obalon' growth, especially considering our understanding of what Apollo Endosurgery is currently doing.  Despite these assumptions, we cannot reconcile forward consensus estimates. We believe FY18 & beyond estimates for Obalon are quite high.  The stock is trading @ $180M market cap (EV = $145M) and our 2-stage DCF shows that intrinsic value is not more than $5 - $6. Hence our rating / [price target].

176.   As a result of this disclosure, Obalon's stock price fell 7.66%, from $10.96 per share to $10.12 per share.

177.   Rather than address this negative information, the Exchange Act Defendants made every effort to conceal it from the public.  After the Northland report, Obalon refused to take questions from Northland at conference calls.  In Northland's next report, dated August 2, 2017, it recounted that "given that we are persona non grata, we did not get a chance to ask questions on the call."  The Exchange Act Defendants continued to ignore Northland throughout the Exchange Act Class Period, as the analyst noted in its November 3, 2017 and May 11, 2018 reports.

178.   But Defendants did not stop there.  In fact, the **only** questions Obalon representatives answered during the Exchange Act Class Period came from the four Underwriter Defendants, who each had a vested interest in the Company and its stock value.  These Underwriter Defendants had just earned $5.2 million in discounts and

commissions as a result of the IPO, and stood to gain more from future financings. When Obalon planned a second public offering January 23, 2018, the same four companies were slated to underwrite the deal.  Further, Defendant Plovanic – the CFO of Obalon – took the job after spending nine years as an analyst at Canaccord, one of the pro-Obalon Underwriter Defendants.  Obalon's plan to quell criticism worked, as the Underwriter Defendants gave much more favorable reports than Obalon deserved. Despite the precipitous decline in Obalon's stock price during the Exchange Act Class Period – from $15.00 per share at the start to $2.85 at the end – *every report from the Underwriter Defendants recommended that investors BUY Obalon stock*.

### 2. Obalon Reveals Its True Financial Condition When It Announces a Secondary Offering and Then Is Forced to Cancel It

179.   Cracks in the façade of the Company's financial condition appeared at the start of 2018, shortly after the Company rushed to flood the market with its fraudulent 4Q 2017 "preliminary, unaudited revenue."  After the market closed on January 16, 2018, Obalon announced that it would return to the market to ask for an additional $35 million in public financing.  This announcement came just 15 months after the Company's IPO raised $67.4 million.  Investors began to understand that the Company's claims of growing sales and "astounding" interest from doctors were overstated and that the Company would not reach viability without outside help.

180.   This disclosure resulted in a three-day slide of Obalon's stock price, which fell from $7.93 on January 16, 2018, to $5.24 on January 19, 2018, a 33.92% decline. The market attributed the fall to the Company's decision to seek further financing.  On the night of the announcement, the website www.investingchannel.com listed Obalon as an "After Hours Mover[]" reporting that "Obalon Therapeutics (OBLN), down 11.7% after it filed to sell $35M in common stock."

181.   Then, on January 23, 2018, Obalon disclosed that a whistleblower had submitted a complaint to the Company's independent auditors at KPMG.   The

complaint described "improper revenue recognition during the Company's fourth fiscal quarter of 2017." As a result of this complaint, Obalon canceled its secondary offering in order to "complete an investigation of the allegations."

182.   On this news, Obalon stock price fell again, this time from $5.19 to $3.46, a 33.33% drop in a single day. Analyst Northland attributed the drop to the disclosure, noting that "*there is a crisis of credibility consuming the company right now, and it's anybody's guess how this whole whistleblower thing shakes out*."

183.   On February 20, 2018, the Company announced that it had completed its investigation. Defendant Plovanic denied any wrongdoing, but highlighted that an Obalon executive stated that the Exchange Act Defendants had attempted to "misle[a]d investors":

> The purported whistleblower's complaint alleged that revenue fraud related to a fourth quarter 2017 sales promotion was improperly recognized. *The whistleblower further alleged that management misled investors as a result*. . . . As previously stated, the investigation concluded that all allegations and the whistleblower complaint were without merit. Preliminary revenues were not misrepresented and management did nothing to mislead investors. We have always had a high level of rigor with accounting policies and procedures. In particular, we work closely with our audit committee to develop robust procedures for appropriately analyzing and recognizing revenue. We hired a dedicated revenue recognition specialist who carefully analyzes our sales and marketing programs, develops a formal position on revenue recognition and presents the analysis to the company's auditors prior to implementing any accounting treatments. We have done this each and every quarter of 2017, including the Q417 promotions and will continue this discipline.

Despite its denial, Obalon did admit that its 4Q 2017 "preliminary unaudited revenues" were inflated. Plovanic said "the previously released preliminary unaudited revenues of 3.9 million for Q417 and 10.1 million for the full year 2017 could change between 5-7% of Q417 revenues and 2-3% of full year 2017 revenues."

184.   Analysts at Northland highlighted the Company's admission that revenues were inflated and its inconsistent claim that Obalon had not misled investors.

1    Northland wrote: "If the audit proves Obalon is in the clear, then the lowering of

2    revenue (~$200K) is a headscratcher."

3         185.   Overall, however, the market credited Obalon's denials.   Canaccord

4    wrote "the findings of the investigation (which deemed the allegations 'meritless')

5    remove the overhang and uncertainty regarding revenue recognition concerns."  As a

6    result, the stock price did not react negatively.

7                    **3.        Poor 1Q 2018 Results Shock the Market**

8         186.   On May 10, 2018, Obalon announced its 1Q 2018 earnings, which were

9    its worst ever in terms of total revenue ($1.3 million), U.S. revenue ($0.5 million),

10   starter kit sales (17), and reorder kit sales (20).  This disclosure revealed that the

11   4Q 2017 results were misleading and not indicative of the Company's future

12   prospects.

13        187.   The Company admitted that its 4Q 2017 promotion may have inflated

14   revenue at the expense of future quarters.  Rasdal said:

15
        We don't know for sure if the New Year's resolution program emptied
16      the new account funnel and we have to rebuild it or there is something
        more organic raising new barriers, as we expand deeper in the market
17      rollout beyond the early adopters.

18        188.   The Company also disclosed the high concentration of reorders

19   emanating from a small handful of health care providers.  Rasdal bragged that "[o]ur

20   top aesthetic practice treats at three sites that we estimate generated almost $1 million

21   in practice revenues."  In so doing, he revealed that this single doctor had used 130

22   balloons, generating $390,000 in revenue for Obalon, which equals 78% of Obalon's

23   total revenue in 1Q 2018.

24        189.   On this news, Obalon's stock price crashed further from $4.32 to $2.85,

25   another 34.03% drop.  Analysts attributed this drop to the disclosure of the

26   Company's inflated 4Q 2017 revenue and its dire financial condition.

27

28

190.   On May 11, 2018, Northland commented on the suspicious timing of the secondary offering and emphasized that the fraudulent 4Q 2017 "numbers were used as a pretext to do a capital raise."  Northland stated:

> The company stated, 'We don't know for sure if the New Year's resolution program emptied the new account funnel and we have to rebuild it or there is something more organic raising new barriers as we expand deeper in the market roll-out beyond the early adopters.  In Q2, we have launched a new starter kit promotion intended to address some of the new objections we learned in Q1 and are hopeful that those efforts will reignite sales to new accounts by the end of Q2.'  As we stated in our note dated 12/06/17, Obalon's marketing program raised a number of questions in our mind. Simultaneously, the company stated that, 'We believe that our increased focus on account utilization in Q1 '18, especially the increased number of patient treatments, could have resulted in over 70% of the inventory sold in Q4 '17, as part of the New Year's resolution promotion being consumed or committed by accounts that treated in Q1, excluding those accounts who may have purchased a starter kit but did not yet treat a patient.'  ***The two statements taken together tell us that there was a significant amount of inventory "pushed" into the field in Q4-17. An interesting point to highlight . . . the Q4 numbers were used as a pretext to do a capital raise*** . . . .  We wonder what would have happened if the deal had been consummated and the current trajectory of revenues would have been realized.

191.   Northland also commented on the high concentration of reorders among a few doctors:

> Another statement that caught our attention, "Our top aesthetic practice treats at 3 sites that we estimate generated almost $1M in practice revenues related to using the Obalon balloon in Q1, which could annualize to almost $4M." Are we interpreting this correctly that 77% of Q1-18 revs were from 1 customer ??? What was going on at other sites then?

192.   Over the course of the Exchange Act Class Period, Obalon's once vaunted stock price withered from $15.00, which analysts regarded as a bargain at the time, to just $2.85 with the Company teetering on the edge of insolvency.  This ***81%*** nosedive in value occurred at the same time investors learned the truth about the Company's ineffective product and its poor financial performance.

**F.   Further Evidence of the Exchange Act Defendants' Scienter**

   **1.   The Fraud Infected Obalon's Core Operations, Which the Exchange Act Defendants Closely Monitored**

193.   As explained above, Obalon's only product is the Obalon Balloon, and the Company's success depended on its ability to compete with other intragastric balloons on the market.   The Exchange Act Defendants each possessed detailed knowledge about the characteristics and sales of the Company's core product and constantly spoke about these characteristics and its sales during conference calls throughout the Exchange Act Class Period.   The Exchange Act Defendants' statements demonstrate their personal understanding of these matters.

194.   The Exchange Act Defendants also worked closely with their financial team to keep apprised of all the Company's accounting.   As Defendant Plovanic admitted during a conference call on February 20, 2018:

> We have always had a high level of rigor with accounting policies and procedures.   In particular, we work closely with our audit committee to develop robust procedures for appropriately analysing and recognizing revenue.   We hired a dedicated revenue recognition specialist who carefully analyzes our sales and marketing programs, develops a formal position on revenue recognition and presents the analysis to the company's auditors prior to implementing any accounting treatments. We have done this each and every quarter of 2017, including the Q417 promotions and will continue this discipline.

   **2.   The Exchange Act Defendants Inflated 4Q 2017 Revenues as a Pretext to Raise Money Through the Secondary Offering**

195.   The Exchange Act Defendants were motivated to inflate the Company's 4Q 2017 revenue so they could use it as a pretext to raise tens of millions of dollars in the secondary offering.   Defendants knew U.S. growth had already stalled by 3Q 2017, so they devised a last ditch attempt to create a false impression of growth in 4Q 2017 and extract more money from investors.   As described above, they launched an aggressive promotion that convinced customers to prematurely order Obalon

Balloons.  Then, given that the Exchange Act Defendants sought to report the highest revenues possible, they failed to reduce these numbers to account for the costs associated with future performance related to the Company's promotion.  They also misclassified reorder kit sales as starter kit sales to create a false impression that new customers had taken an interest in the product.  As soon as the quarter was complete, the Exchange Act Defendants hurried to report and capitalize on these fraudulent numbers.

196.   The accelerated timeline between the close of the quarter and the planned secondary offering reveals the Exchange Act Defendants' desperate attempt to close the deal before investors could learn the truth about the Company's financial condition.  Just five days into 2018 – and months before it would normally do so – Obalon announced that it had already calculated its 4Q 2017 revenues and rushed to report its "unaudited" numbers to the market.  On January 5, 2018, the Exchange Act Defendants held a premature conference call solely to tout its performance to investors.  On the call, the Exchange Act Defendants lauded 4Q 2017 as the "strongest quarter [to date]" and its "highest quarter ever" in several important metrics, and declared 2017 a "transformational year" for the Company.

197.   Just 11 days after this announcement, and before investors could learn that the revenues were inflated through faulty accounting and an unsustainable promotion, the Exchange Act Defendants announced that they would return to the market to seek $35 million from investors.  In the offering materials for the secondary offering, the Company again emphasized its 4Q 2017 performance to persuade investors to purchase its stock.  The Company said "the fourth quarter of 2017 was our highest quarter in the year."  The Exchange Act Defendants attempted to jam the financing through before the Company reported its audited 4Q 2017 revenues in early March.  It scheduled the secondary offering to close just one week after it was announced, and barely three weeks after 4Q 2017 ended.  There is no rational, innocent explanation for the Exchange Act Defendants' extreme hurry to close the

financing, as they had sufficient cash on hand to pay for Company operations.  As Northland "highlight[ed]," on May 11, 2018, "***the Q4 numbers were used as a pretext to do a capital raise***."

> **3.    Defendants Rasdal and Plovanic Signed Sarbanes-Oxley Certifications Attesting that the Company's Financial Reports Were Accurate**

198.   While the Company was engaging in accounting fraud in 4Q 2017 and 1Q 2018, Defendants Rasdal and Plovanic personally certified the accuracy of the Company's financials.  In both the Form 10-Q, filed on November 3, 2017, and the Form 10-K, filed on March 5, 3018, Rasdal and Plovanic certified that:

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report. . . .

199.   Rasdal and Plovanic further certified that:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have: . . . (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. . . .

> **4.    The Exchange Act Defendants' Compensation Structure Incentivized Fraud**

200.   As a result of Obalon's compensation structure, the Exchange Act Defendants had a direct incentive to manipulate the Company's revenues. Obalon explained its compensation structure, including financial incentives, in its Registration Statement filed in anticipation of the IPO and its Annual Reports.  Executive compensation changes are within the "sole discretion" of Obalon's compensation committee.  The Company's 2016 Equity Incentive Plan permits awards of "stock options, restricted stock awards, stock appreciation rights, restricted stock units,

performance awards, cash awards and stock bonuses." The specific amount of each award depends on each executive's achievement of "performance goals," which "may be based on GAAP or non-GAAP results and any actual results may be adjusted by the compensation committee."

201.   This flexible plan allowed the compensation committee to provide large bonuses and raises when the Company performed well, which it did during the beginning of the Exchange Act Class Period. For example, on November 9, 2016, as a result of a successful IPO, Rasdal enjoyed massive amounts of increased compensation. Rasdal received the following among other things:

- $250,000 achievement bonus;

- $250,000 discretionary bonus;

- $250,000 (62.5%) raise; and

- $530,000 increase to the next year's potential bonus, from $120,000 to $650,000.

In total, Defendant Rasdal's compensation grew from $598,028 in 2015 to $2,291,441 in 2016, a ***383% increase***.

202.   At the same time, and even though he had been CFO for less than a year, the Company paid Defendant Plovanic $646,538 in bonuses, which was ***more than double*** his partial-year salary of $258,670. On November 28, 2017, Plovanic received another bump in compensation, when the compensation committee increase his full-year salary from $315,000 to $400,000 (27%).

**G.   Exchange Act Loss Causation**

203.   During the Exchange Act Class Period, as detailed herein, the Exchange Act Defendants made false or misleading statements and/or omissions that artificially maintained inflation in the price of Obalon stock. Later, when the alleged truth was disclosed, the price of Obalon stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Obalon stock during the Exchange Act Class Period, Lead Plaintiff and other members of the Exchange

1   Act Class suffered economic losses, *i.e.*, damages, within the meaning of the federal

2   securities laws.

3        204.   At all relevant times, the material misrepresentations and/or omissions

4   particularized in this Complaint proximately caused or were a substantial contributing

5   cause of the damages sustained by Lead Plaintiff and other members of the Exchange

6   Act Class.  As described herein, during the Exchange Act Class Period, Exchange Act

7   Defendants made or caused to be made a series of materially false or misleading

8   statements and/or omissions about Obalon's business.  Exchange Act Defendants'

9   materially false or misleading statements during the Exchange Act Class Period

10  resulted in Lead Plaintiff and other members of the Exchange Act Class purchasing

11  the Company's common stock at artificially inflated prices, thus causing the damages

12  complained of herein, upon the revelations of the alleged truth and resulting collapse

13  of Obalon's stock price.

14       205.   The inflation in Obalon stock was dissipated through a series of partial

15  disclosures of the alleged truth.   As a result of disclosures on June 21, 2017,

16  January 16, 2018, January 23, 2018, and May 10, 2018, Obalon's stock price suffered

17  significant declines.  *See* §V.E.  The significant stock price declines upon release of

18  information reflecting the Company's true financial condition were due to firm-

19  specific information, and not a result of market or industry.   Individually and

20  collectively, these drops removed the inflation from Obalon's stock price, causing real

21  economic losses to investors who had purchased the stock during the Exchange Act

22  Class Period.

23       **H.    Exchange Act Presumption of Reliance**

24       206.   Lead Plaintiff will exclusively rely upon the presumption of reliance

25  established by the fraud-on-the-market doctrine in that, among other things:

26            (a)   Exchange Act Defendants made public misrepresentations or failed

27  to disclose material facts during the Exchange Act Class Period;

28            (b)   The omissions and/or misrepresentations were material;

1        (c)    The Company's common stock traded in an efficient market;

2        (d)    The misrepresentations and omissions alleged would tend to

3 induce a reasonable investor to misjudge the value of the Company's common stock;

4 and

5        (e)    Lead Plaintiff and other members of the Exchange Act Class

6 purchased Obalon common stock between the time the Exchange Act Defendants

7 misrepresented or failed to disclose material facts and the time that the true facts were

8 disclosed, without knowledge of the misrepresented or omitted facts.

9     207.   At all relevant times, the market for Obalon common stock was efficient

10 for the following reasons, among others:

11        (a)    Throughout the Exchange Act Class Period, Obalon common stock

12 was listed and actively traded on the NASDAQ, a highly efficient and automated

13 market;

14        (b)    Throughout the Exchange Act Class Period, the average weekly

15 trading volume of Obalon shares exceeded 2% of its total outstanding shares;

16        (c)    Throughout the Exchange Act Class Period, several different firms

17 and analysts covered Obalon common stock;

18        (d)    Throughout the Exchange Act Class Period, Obalon was eligible to

19 file an SEC S-3 Registration Statement;

20        (e)    As a regulated issuer, Obalon filed periodic public reports with the

21 SEC; and

22        (f)    Obalon regularly communicated with public investors via

23 established market communication mechanisms, including through regular

24 dissemination of press releases on the major news wire services and through other

25 wide-ranging public disclosures, such as communications with the financial press,

26 securities analysts and other similar reporting services.

27

28

## I.   No Safe Harbor for Exchange Act Violations

208.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements pleaded in this Complaint.

209.   None of the statements complained of herein was a forward-looking statement.   Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Obalon Balloon's characteristics and Obalon's financial condition.

210.   To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, then-existing facts contradicted the Exchange Act Defendants' statements regarding the Obalon Balloon's characteristics and Obalon's financial condition.   Given the then-existing facts contradicting the Exchange Act Defendants' statements, any generalized risk disclosures made by Obalon were not sufficient to insulate the Exchange Act Defendants from liability for their materially false or misleading statements.

211.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those materially false or misleading forward-looking statements because, at the time each statement was made, the speaker knew that it was false or misleading or the statement was authorized or approved by an Obalon executive officer who knew that the statement was false or misleading when made.

## J.   Exchange Act Class

212.   Lead Plaintiff brings this action as a class action on behalf of all those who purchased Obalon common stock during the Exchange Act Class Period

(collectively, the "Exchange Act Class").  Excluded from the Exchange Act Class are the Exchange Act Defendants and their families, the officers, directors and affiliates of the Exchange Act Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which the Exchange Act Defendants have or had a controlling interest, as well as the judicial officers overseeing this action and their immediate families.

213.   The members of the Exchange Act Class are so numerous that joinder of all members is impracticable.  Obalon stock is actively traded on the NASDAQ. While the exact number of Exchange Act Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Exchange Act Class because approximately 23 million shares were outstanding as of the date of this filing. Record owners and other members of the Exchange Act Class may be identified from records maintained by Obalon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

214.   Lead Plaintiff's claims are typical of the claims of the members of the Exchange Act Class, as all members of the Exchange Act Class are similarly affected by the Exchange Act Defendants' wrongful conduct in violation of federal law as complained of herein.

215.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Exchange Act Class and has retained counsel competent and experienced in class and securities litigation.

216.   Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class.  These questions of law and fact common to the Exchange Act Class include:

(a)     whether the Exchange Act Defendants violated the Exchange Act and Rule 10b-5 promulgated thereunder;

(b)     whether the Exchange Act Defendants made false or misleading statements of material fact during the Exchange Act Class Period;

(c)     whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false or misleading during the Exchange Act Class Period;

(d)     whether the price of Obalon stock was artificially inflated;

(e)     whether the market for Obalon common stock was efficient; and

(f)     the extent of damage sustained by Exchange Act Class members and the appropriate measure of damages.

217.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### K.     Exchange Act Causes of Action

### COUNT III

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against Obalon, Rasdal, and Plovanic**

218.   Lead Plaintiff incorporates ¶¶1-31 and 82-217 by reference as though set forth fully herein.

219.   During the Class Period, the Exchange Act Defendants carried out a plan, scheme, and course of conduct intended to and, throughout the Exchange Act Class Period, did: (a) deceive the investing public, the Lead Plaintiff, and other Exchange Act Class members, as alleged herein; (b) artificially inflate and maintain the market

1   price of the Company's publicly traded securities; and (c) cause Lead Plaintiff and

2   other members of the Exchange Act Class to purchase the Company's publicly traded

3   securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan,

4   and course of conduct, each one of the Exchange Act Defendants took the actions set

5   forth herein.

6          220.   The Exchange Act Defendants: (a) employed devices, schemes, and

7   artifices to defraud; (b) made untrue statements of material fact and/or omitted to state

8   material facts necessary to make the statements not misleading; and (c) engaged in

9   acts, practices, and a course of business which operated as a fraud and deceit upon the

10   purchasers of the Company's securities in an effort to maintain artificially high market

11   prices for the Company's securities in violation of §10(b) of the Exchange Act and

12   Rule 10b-5.  The Exchange Act Defendants are sued as primary participants in the

13   wrongful and illegal conduct charged herein.

14          221.   In addition to the duties of full disclosure imposed on the Exchange Act

15   Defendants as a result of their affirmative statements and reports, or participation in

16   the making of affirmative statements and reports to the investing public, each had a

17   duty to promptly disseminate truthful information that would be material to investors

18   in compliance with the integrated disclosure provisions of the SEC as embodied in

19   SEC Regulation S-X (17 C.F.R. §210.1-01, *et seq.*) and S-K (17 C.F.R. §229.10, *et*

20   *seq.*) and other SEC regulations, including accurate and truthful information with

21   respect to the Company's operations, sales, financial condition, and operational

22   performance, so that the market prices of the Company's publicly traded securities

23   would be based on truthful, complete, and accurate information.

24          222.   The Exchange Act Defendants, individually and in concert, directly or

25   indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the

26   mails, engaged and participated in a continuous course of conduct to conceal adverse

27   material information about the Company's financial and operational results and

28   prospects as specified herein.

223.   Each of the Exchange Act Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and/or omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Exchange Act Class Period.

224.   Defendants Rasdal's and Plovanic's primary liability and controlling person liability arise from the following facts, among others: (a) they were high-level executives at the Company during the Exchange Act Class Period; (b) by virtue of their responsibilities and activities as senior executive officers, they were privy to, and participated in, the creation, development, and reporting of the Company's projections and financial condition; (c) they enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) they were aware of the Company's dissemination of information to the investing public which they knew, or recklessly disregarded, was materially false or misleading.

225.   Each of the Exchange Act Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them.   Such Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or

1    with recklessness and for the purpose and effect of concealing information regarding

2    the Company's true financial and operational results and prospects from the investing

3    public and supporting the artificially inflated price of its securities.  As demonstrated

4    by the Exchange Act Defendants' misstatements or omissions throughout the

5    Exchange Act Class Period regarding the Company's true financial and operational

6    results and prospects, the Exchange Act Defendants, if they did not have actual

7    knowledge of the misrepresentations and/or omissions alleged, were reckless in failing

8    to obtain such knowledge by deliberately refraining from taking the steps necessary to

9    discover whether their statements were false or misleading.

10          226.   As a result of the dissemination of the materially false or misleading

11   information and/or failure to disclose material facts, as set forth above, the market

12   prices of the Company's securities were artificially inflated during the Exchange Act

13   Class Period.  In ignorance of the fact that market prices of the Company's publicly

14   traded securities were artificially inflated, and relying directly or indirectly on the

15   Exchange Act Defendants' false or misleading statements, the integrity of the market

16   in which the securities trade, and/or on the absence of material adverse information

17   known to (or disregarded with recklessness by) but not disclosed by the Exchange Act

18   Defendants, Lead Plaintiff and other members of the Exchange Act Class acquired the

19   Company's securities during the Exchange Act Class Period at artificially high prices

20   and were damaged thereby, as evidenced by, among others, the securities price

21   declines above.

22          227.   At the time of the misrepresentations and/or omissions, Lead Plaintiff and

23   other members of the Exchange Act Class were ignorant of their falsity and believed

24   them to be true.  Had Lead Plaintiff and other members of the Exchange Act Class and

25   the marketplace known of the Company's fraudulent practices, the true nature and

26   prospects of its financial and operating results and prospects, or its true intrinsic value,

27   which were not disclosed by the Exchange Act Defendants, Lead Plaintiff and other

28

members of the Exchange Act Class would not have purchased or acquired the Obalon stock or not at the artificially inflated prices paid.

228.   By virtue of the foregoing, each of the Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

229.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiff and other members of the Exchange Act Class suffered damages as evidenced by the securities price declines that occurred when the artificial inflation was removed from the Company's securities.

### COUNT IV

**For Violation of §20(a) of the Exchange Act**
**Against Rasdal and Plovanic**

230.   Lead Plaintiff incorporates ¶¶1-31 and 82-229 by reference as though set forth fully herein.

231.   Defendants Rasdal and Plovanic acted as controlling persons of Obalon within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of its fraudulent practices and actual results and future prospects, Rasdal and Plovanic had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false or misleading. Rasdal and Plovanic were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

232.   In addition, Defendants Rasdal and Plovanic had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had

1 | the power to control or influence the particular transactions giving rise to the

2 | securities violations as alleged herein and exercised the same.

3 | 233.  As set forth above, the Exchange Act Defendants each violated §10(b)

4 | and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of

5 | their controlling positions, Rasdal and Plovanic are liable pursuant to §20(a) of the

6 | Exchange Act.  As a direct and proximate result of Rasdal's and Plovanic's wrongful

7 | conduct, Lead Plaintiff and other members of the Exchange Act Class suffered

8 | damages as evidenced by the securities price declines that occurred when the artificial

9 | inflation was removed from the Company's securities.

10 | **PRAYER FOR RELIEF**

11 | WHEREFORE, Plaintiffs pray for relief and judgment as follows:

12 | A.  Determining that this action is a proper class action, certifying Plaintiffs

13 | as the Class Representatives under Rule 23 of the Federal Rules of Civil Procedure

14 | and appointing Lead Counsel to serve as Class Counsel;

15 | B.  Declaring that the Securities Act Defendants are liable pursuant to the

16 | Securities Act;

17 | C.  Declaring that the Exchange Act Defendants are liable pursuant to the

18 | Exchange Act;

19 | D.  Awarding compensatory damages in favor of Plaintiffs and the other

20 | Securities Act Class and Exchange Act Class members (the "Classes") against all

21 | Defendants, jointly and severally, for all damages sustained as a result of Defendants'

22 | wrongdoing, in an amount to be proven at trial, including interest thereon;

23 | E.  Awarding Plaintiffs and the Classes pre-judgment and post-judgment

24 | interest as well as reasonable attorneys' fees and expenses incurred in this action; and

25 | F.  Awarding such other relief as the Court may deem just and proper.

26

27

28

1
## JURY DEMAND

2
    Plaintiffs demand a trial by jury.

3
DATED:  October 5, 2018                          ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
4                                                RACHEL L. JENSEN
                                                 ROBERT R. HENSSLER JR.
5                                                JEFFREY J. STEIN

6

7                                                      s/ Robert R. Henssler Jr.
                                                     ROBERT R. HENSSLER JR.
8
                                                 655 West Broadway, Suite 1900
9                                                San Diego, CA  92101
                                                 Telephone:  619/231-1058
10                                               619/231-7423 (fax)

11                                               Lead Counsel for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28